OPINION
{¶ 1} Defendant-Appellant, Brenda Kay Crawford, appeals the judgment of the Union County Court of Common Pleas terminating her marriage with Plaintiff-Appellee, Christopher M. Crawford. On appeal, Brenda argues that the trial court abused its discretion by ordering her to pay Christopher spousal support; that the magistrate abused her discretion by failing to qualify one of her witnesses as an expert; and, that the trial court abused its discretion when it granted Christopher unsupervised visitation with the parties' minor child. Based on the following, we affirm the judgment of the trial court.
 {¶ 2} Christopher and Brenda were married in 1994 and have one minor child born as issue to their marriage, Katja Crawford, born on October 19, 1994, who has been diagnosed with a central auditory processing disorder.
 {¶ 3} During the parties' marriage, Christopher was diagnosed with IgA Nephropathy, a kidney disease, which required him to undergo dialysis. In 2004, it was determined that Christopher's kidneys were failing.
 {¶ 4} In June 2005, Brenda and Christopher split.
 {¶ 5} On October 11, 2005, in case number 05-DR-196, Christopher filed a complaint for divorce, a motion for temporary orders and appointment of a guardian ad litem (hereinafter referred to as "GAL"), and a request for discovery.
 {¶ 6} On October 18, 2005, the magistrate appointed a GAL. *Page 3 
 {¶ 7} On October 19, 2005, Brenda filed a motion to consolidate case number 05-DR-196 with case number 05-DR-155, which was created for a complaint she filed for divorce prior to Christopher's filing, but failed to obtain service first.
 {¶ 8} On October 21, 2005, the magistrate consolidated the cases and accepted Brenda's complaint for divorce as a counterclaim.
 {¶ 9} In November 2005, the magistrate issued temporary orders, which included that Christopher could exercise supervised visitation with Katja, that neither party was required to pay child support, and that Christopher reserved the right to pursue his request for spousal support at the final hearing.
 {¶ 10} In February 2006, the GAL filed a report, which provided that the GAL recommended that Brenda remain as residential parent and that Christopher have supervised day-time visitation on a schedule that is the least disruptive to Katja's schooling. Additionally, the case proceeded to a final hearing, which was held over four days from February to May 2006.
 {¶ 11} At the beginning of the hearings, the parties stipulated to jurisdiction and venue, that incompatibility would be the grounds for divorce, that Brenda would have residential parent status of Katja, and that the issues left for consideration were visitation and spousal support. After the stipulations were made, the following testimony was heard: *Page 4 
 {¶ 12} Tamara Cox, a next door neighbor to the parties, indicated that Christopher was with Katja for the majority of the time and had a close relationship with her and that she never saw anything inappropriate occur between them. Additionally, Steven Cox, Tamara's husband, testified that he has not seen anything he would consider inappropriate happen between Christopher and Katja; that Christopher and Katja are close; but, that he never saw Christopher and Katja interact inside their house outside of Brenda's presence.
 {¶ 13} Lynn Crawford, Christopher's mother, testified that after Katja turned three, Christopher became her main care taker and has been a really good father; that three times a week Christopher has dialysis performed on his kidneys; that Christopher went through a long period of depression and sought help on his own; that Christopher lives in the third story of her home and would be willing to allow him to have visitations with Katja there, if given expanded visitation; that she has never seen Christopher do or say anything inappropriate to Katja; and, that she did not believe that Christopher needed supervision while watching Katja.
 {¶ 14} Dennis Shepard, who works at a horse boarding facility that Brenda uses, testified that he had seen Christopher interact with Katja, thought Christopher had a good relationship with her, and never saw anything unusual between them. Shepard also indicated that he volunteered to be present during one of Christopher's recent supervised visitations with Katja; that during this visit, *Page 5 
Brenda's niece, Kelly Hess, dropped off Katja; that when Kelly is around Katja, Katja acts restricted; and, that since Kelly was around, Christopher was unable to properly meet with his daughter. On cross-examination, Shepard indicated that he's observed Christopher and Katja interact at least a dozen times over the past couple summers.
 {¶ 15} Dr. Cynthia Nicholas, a clinical psychologist, testified that she received her bachelors degree in psychology from the University of Maine and received a Ph.D. in clinical psychology from Gallaudet University in Washington D.C.; that since 2000, she has been practicing independently; that she "refer[s] to [her]self as a generalist practitioner working with families, couples, children, and individuals" (Feb. 14, 2006 Tr. p. 54); that she received a license to practice from the Ohio State Board of Psychology in 2002; and, that she practices with children between 40 to 60 percent of the time. Brenda then moved to have her "qualified as a * * * [psychologist", Christopher's counsel objected, and the magistrate withheld her ruling until she heard some testimony. (Feb. 14, 2006 Tr. p. 56). Dr. Nicholas continued that she has taken continuing education courses that focus "on issues related to families, families of divorce, children with any particular kinds of maladies or clinical issues." (Feb. 14, 2006 Tr. p. 56). Next, the trial court had the following exchange with Dr. Nicholas: *Page 6 
 The Court: Let me stop you for just a minute. Have you had any training with regard to children that have processing disorders like Katja does?
 [Dr. Nicholas]. Yes I do.
 The Court: Okay. Tell me what kind of training that you have. A. Well, I have a specialization in working with people with disabilities, specifically with hearing disabilities. Katja has been diagnosed with auditory processing disability. And that is actually under the rubric of hearing issues, auditory and brain based cognitive issues.
 The Court: Okay. But have you had specific training with regard to that? And what training have you had?
 A. I've had training for five years at Gallaudet University, which is the only liberal arts college in the world that focuses on people with hearing loss.
 The Court: All right. Have you also had training or have you also had courses dealing with families going through divorces and with one parent who makes sexual allegations with regard to another parent where a child is involved?
 A. Yes. Yes. I'm going to refer back to generalist training working with families of all kind. Of course, divorce being a huge issue. And then seminars and so on and so forth throughout the years.
 The Court: All right. What was your most recent training with regard to those issues?
 A. Issues of divorce?
 The Court: Issues of divorce wherein one parent's making sexual allegations with regard to the other parent where a child or children are involved?
 A. Let me think about this because it was not recent. Probably about four years ago.
 The Court: Four years ago?
 A. Yes.
(Feb. 14, 2006 Tr. pp. 57-58). Based on this information, the magistrate determined that she was not going to qualify Dr. Nicholas as an expert witness with regard to families going through divorces with one parent who makes sexual *Page 7 
allegations with regard to another parent where a child is involved, but did qualify her as an expert to testify regarding the child's audio processing disability. Brenda did not object to the magistrate's ruling nor proffer any testimony from Dr. Nicholas.
 {¶ 16} Dr. Nicholas then indicated that she saw Katja in May 2005, after Brenda had contacted her; that Katja was anxious and distressed; that Katja was afraid of her father; and, that Katja suffered from stress syndromes. Dr. Nicholas also described Katja's disability and her ability to communicate.
 {¶ 17} On cross-examination, Dr. Nicholas testified that during a joint visit with the parties and Katja, Katja sat on Christopher's lap. On redirect-examination, Dr. Nicholas testified that Katja would lock the door to the waiting room because she did not want Christopher in the room while she is there and that Katja stated that she was afraid of adult men, which included her father.
 {¶ 18} Officer Don McGlenn, a detective with the Marysville Police Department, testified that Kathleen Albanese of the Department of Human Services filed a police report on July 21, 2005, alleging that Christopher had inappropriately touched Katja and that he investigated the allegations. Officer McGlenn indicated that he took Katja to Children's Hospital for a forensic assessment, searched Brenda's residence, and interviewed Christopher, who denied any allegations that he inappropriately touched his daughter. Officer *Page 8 
McGlenn testified that Christopher voluntarily took a polygraph test. Officer McGlenn then discussed that he also investigated whether Christopher possessed child pornography on the family computer. Officer McGlenn indicated that there were currently no pending cases with regards to the alleged improper touching or illegal pornography against Christopher.
 {¶ 19} Next, Kathleen Albanese, the supervisor of the intake unit of the Children Services Department of the Union County Department of Job and Family Services, testified that in the summer of 2005, an allegation of sexual abuse was made against Christopher; that there was an investigation performed; and, that the result of the investigation was that Katja's allegations were unsubstantiated. Ms. Albanese also indicated that there were no ongoing investigations against Christopher.
 {¶ 20} After being cross-examined, the GAL questioned Ms. Albanese. During the GAL's questions, Ms. Albanese indicated that the standard investigation consisted of speaking with the alleged child victim, the parent, the alleged perpetrator, and any other adults or children that would live in the home; that a risk assessment would be completed with regards to the family; and, that based on this information, a disposition of substantiated or unsubstantiated is determined. *Page 9 
 {¶ 21} Terry Hess, Christopher's sister-in-law and Brenda's sister, testified that Christopher was Katja's primary care giver; that Christopher was very attentive to both Katja's and Brenda's needs; that over the last three years, she had not noticed anything that changed in regard to the interaction between Christopher and Katja; that she has never seen Christopher inappropriately conduct himself; that she would have no problem entrusting her own children with Christopher's mother; and, that she could not think of any reason why Christopher should not be permitted to regularly visit with Katja.
 {¶ 22} Officer Dennis James Flanagan, a police officer for the City of Marysville who also works as a DARE officer, testified that he had contact with Katja; that the staff at Katja's school referred her to him, because of safety concerns she had expressed to the staff; and, that Katja was frightened of her father.
 {¶ 23} Christopher testified that when Katja turned two or three years old, he and Brenda found out that she had an auditory processing disorder; that when Katja was between six to eight years old, the parties decided that he would adjust his work schedule so that he could take care of Katja, while Brenda became the main wage earner in the family; that his IgA Nephropathy requires him to be on dialysis three times a week for four hours and fifteen minutes each time; and, that *Page 10 
after he started dialysis, he became depressed and would take his anger out on his dog, which probably scared Katja.
 {¶ 24} Christopher also noted that towards the end of May 2005, Brenda asked him to leave; that after he left the marital residence, he moved in with Dennis Shepard for about two and a half months, after which, he moved in with his mother; and, that once he moved out of his marital residence, Brenda did not allow him to see Katja where he was staying or take her anywhere.
 {¶ 25} Christopher continued that once this case began, the magistrate ordered supervised visitation, which has not gone well because "Brenda always seems to have an excuse * * * for [him] not to see Katja" (Mar. 21, 2006 Tr. p. 65); that the first supervisor quit because she got tired of Brenda calling her all the time and asking her questions, and the second supervisor lasted one day; that they have tried a friend of his mother and Dennis Shepard as supervisors, before the court ordered his mother to be the supervisor; that he has read through the court's general visitation schedule and could not think of any reason why he should not be permitted to visit with Katja on that schedule; that he wants to visit with Katja according to the court's general visitation schedule; that he would like summer visitation with Katja, but it would not be in her best interest for him to have her for the summer, because of his medical condition; and, that he would prefer to have *Page 11 
more available visitation during the summer months, because Katja would not be in school.
 {¶ 26} Christopher also denied doing anything inappropriate with Katja and has sought counseling for his depression and other issues, discussed specific times when he was to visit with Katja where Brenda's niece would follow them around against his wishes, and identified times when Brenda had a male friend with her when an exchange of Katja occurred against court orders.
 {¶ 27} Christopher indicated that he receives $1,180 a month from Social Security and that he is not allowed to make more than $810 a month from his job at Columbus Instruments, so he works there approximately 10 hours a week; that Katja receives $600 a month from his Social Security benefits in addition to the $1,180 a month he receives; that he spends $400 a month on his car loan payment, $65 to $70 a month on his cell phone bill, $300 to $400 a month on gas, and $100 a month in co-pays for his medications, since he is on Brenda's medical insurance. Christopher also discussed debts of the parties and his questions about the summary of debts that Brenda provided the court.
 {¶ 28} On cross-examination, Christopher testified that he has missed some of Katja's parent-teacher conferences, because of his health and Brenda not telling him when the conferences were. Christopher also testified that if he wants to keep his Social Security benefits, he is only allowed to make $810 a month before taxes *Page 12 
regardless of the source of income, but was unsure how spousal support would affect his Social Security benefits. Christopher also noted that he and Brenda had screamed and yelled at each other and that if given standard visitation, he would purchase a bed and Katja would have a room in his mother's residence.
 {¶ 29} Cara Christine Pack, a hygienist at Katja's dentist's office, indicated that in September 2005, while cleaning Katja's teeth, she asked Katja how she was feeling; that after talking with Katja, she called Children's Services to explain her concern; and, that she is a mandated reporter, required to report anything heard pertaining to sexual incidents.
 {¶ 30} Brenda then testified on her own behalf. Brenda discussed how Katja was diagnosed with central auditory processing disorder and described the disorder; that Christopher attended only one or two conferences with Katja's teachers; that Katja had told her things that caused her concern involving Christopher; that when he was moving out of the marital residence, with Katja nearby, Christopher had told her he was suicidal and called his dialysis provider and his Nephrologist and told them that he no longer needed their services; that Christopher had many emotional ups and downs, and she became afraid of him; that Christopher has some visitation time left to make up; that she did not believe that Christopher's mother was properly supervising the visits between Christopher and Katja; that she would prefer to have her sister, Terry Hess, or Terry's *Page 13 
daughter, Kelly Hess, supervise the visits between Christopher and Katja; that she has issues with Christopher's mother's residence, because Christopher's mother's dog is old and does not go to the bathroom outside, and the residence has not been sprayed for lice; that she and Christopher had used credit cards to consolidate debt from other credit cards; that she works with the Link Group, making $55,000 a year; that Christopher has gotten upset recently due to misunderstandings on drop off times; that Christopher and his mother took Katja bra shopping against her wishes; and, that she did not have sufficient funds to pay out extra expenses related to spousal support. Additionally, Brenda provided evidence of her income, debts, and assets in order to determine support.
 {¶ 31} On cross-examination, Brenda answered questions about some marital assets and debts and testified that she terminated Christopher's health insurance coverage in August 2005, because she could not afford to pay for it; that she disagreed with Terry Hess' opinion about Christopher's relationship with Katja; that Christopher has had to appear in two separate court settings, one for a civil protection order violation and one for a criminal violation of a protection order; and, that she used to put telephone conversations between Christopher and Katja on speaker phone, but she stopped doing that. *Page 14 
 {¶ 32} On redirect-examination, Brenda indicated that Christopher was without medical insurance for approximately 30 days from September 30, 2005, to November 1, 2005, because she lost her job and had to find a new one.
 {¶ 33} Next, Kelly Hess, Brenda's niece, testified that beginning in 1998, she lived with Brenda and Christopher for three years; that she stopped living with Brenda and Christopher, because she felt uncomfortable with Christopher's actions towards her, including an incident when Christopher tickled the upper portion of her body; that she baby-sat for Katja; that Katja has a fear of sleeping in her own room; and, that Katja was definitely afraid of Christopher.
 {¶ 34} On cross-examination, Kelly indicated that she would do things Katja asked her to do in order to alleviate Katja's fears; that she did not feel that Katja was necessarily close to Christopher's mother; that Christopher's relationship with Katja was "very manipulative" (May 18, 2006 Tr. p. 66); and, that she thought Christopher was "a bad father" (May 18, 2006 Tr. p. 67). On cross-examination by the GAL, Kelly testified that she probably made statements to Katja to be careful around Christopher.
 {¶ 35} Next, Terry Hess, Brenda's sister, testified on rebuttal redirect-examination. Terry indicated that she and her son go with Christopher, his mother, and Katja to do things, because it makes Katja feel better; that she has had holiday meals with Christopher, his mother, and Katja; that when Katja sleeps *Page 15 
over at her house, she sleeps in the same room with Katja, but not in the same bed; and, that Brenda and Christopher's mother were very close through the years, but that it has recently changed dramatically.
 {¶ 36} On cross-examination, Terry indicated that Brenda has felt animosity towards Christopher's mother and that Kelly never lived with Brenda and Christopher, other than for part of a summer.
 {¶ 37} Finally, Christopher testified again on his own behalf on rebuttal. Christopher noted that he thought that visitation with Katja was currently going "pretty decent" (May 18, 2006 Tr. p. 83) and that he still wanted regular visitation rights. On cross-examination, Christopher noted that he did not find it inappropriate for his mother to take Katja to be fitted for a bra and that Brenda never told him or his mother that she did not want them to take Katja to be fitted for a bra.
 {¶ 38} In March 2006, Brenda requested an in camera interview, which was conducted at the March 21, 2006 hearing.
 {¶ 39} In May 2006, Christopher moved for a second in camera interview, but later withdrew his motion.
 {¶ 40} In June 2006, Christopher and Brenda filed proposed findings of fact and conclusions of law. *Page 16 
 {¶ 41} In July 2006, the magistrate issued her decision. In the decision, the magistrate found, among other things, that the parties stipulated that Brenda would be residential parent and legal custodian of Katja; that after considering the factors listed under R.C. 3109.05.1(D)(1)-(16), Christopher be awarded unsupervised companionship time with Katja in accordance with the Union County Standard Visitation Guidelines; that Brenda be granted the tax dependency exemption for Katja and shall carry health insurance for Katja and pay for all uncovered medical expenses for her; and, that after considering the factors listed under R.C. 3105.18(C)(1)(a)-(n), spousal support was both appropriate and reasonable and awarded Christopher $300 per month for five years in spousal support.
 {¶ 42} Brenda filed objections to the magistrate's decision. Specifically, Brenda objected to, among other things, the magistrate's failure to order supervised visitation between Christopher and Katja, to qualify Dr. Nicholas1 as an expert witness, and to the allocation of spousal support to Christopher. Subsequently, the trial court overruled Brenda's objections.
 {¶ 43} In August 2006, the trial court entered a judgment entry-decree of divorce.
 {¶ 44} It is from this judgment Brenda appeals, presenting the following assignments of error for our review.
Throughout the magistrate's and trial court's entries, Dr. Nicholas' last name is spelled "Nickless." *Page 17 
 Assignment of Error No. I THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING SPOUSAL SUPPORT.
 Assignment of Error No. II IT WAS AN ABUSE OF DISCRETION FOR THE MAGISTRATE NOT TO QUALITY (Sic.) THE PSYCHOLOGIST AS AN EXPERT WITNESS.
 Assignment of Error No. III IT WAS AN ABUSE OF DISCRETION FOR THE TRIAL COURT TO GRANT UNSPERVISED (Sic.) COMPANIONSHIP TIME.
 Standard of Review {¶ 45} Each of Brenda's assignments of error requires us to apply the abuse of discretion standard. See Kreilick v. Kreilick,161 Ohio App.3d 682, 2005-Ohio-3041, at ¶ 23, citing Bowen v. Bowen (1999),132 Ohio App.3d 616, 626 (noting that a trial court's decision to grant or deny a request for spousal support is reviewed by an appellate court under the abuse of discretion standard); Miller v. Bike Athletic Co.,80 Ohio St.3d 607, 616, 1998-Ohio-178, citing Calderon v. Sharkey (1982), 70 Ohio St.2d 218 (noting that a trial court has broad discretion regarding the admissibility of expert testimony and that a reviewing court should not disturb such an admissibility decision absent an abuse of discretion); Booth v. Booth (1989), 44 Ohio St.3d 142, 144 (noting that an appellate court will not disturb a trial court's decision regarding visitation rights absent an abuse of *Page 18 
discretion). An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude in reaching its judgment was unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 Assignment of Error No. I {¶ 46} In her first assignment of error, Brenda argues that the trial court abused its discretion by awarding Christopher spousal support. Specifically, Brenda asserts that awarding Christopher spousal support will not benefit him, while it harms her. Additionally, Brenda argues that the trial court failed to indicate the basis for its award in sufficient detail for this Court to determine if the award is fair, equitable, and in accordance with R.C. 3105.18(C)(1). We disagree.
 {¶ 47} "`As part of a divorce proceeding, a trial court has equitable authority to divide and distribute the marital estate, and then consider whether an award of sustenance alimony would be appropriate.'"Heitzman v. Heitzman, 3d Dist. No. 3-05-11, 2005-Ohio-4622, at ¶ 3
quoting Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67. In determining whether spousal support is "appropriate and necessary" trial courts must consider "all the factors listed in R.C. 3105.18(C)(1)." Lee v.Lee, 3d Dist. No. 17-01-05, 2001-Ohio-2245. "Additionally, specific findings must be made by the trial court to enable a reviewing court to determine the reasonableness of its order to grant or deny a request for spousal support and *Page 19 
that the relevant factors within R.C. 3105.18 were considered." Id. citing Kaechele v. Kaechele (1988), 35 Ohio St.3d 93, 96-97.
 {¶ 48} Here, the trial court considered the factors listed in R.C.3105.18(C)(1). Specifically, the trial court considered the incomes of the parties, each parties' earnings potential, the ages and physical, mental, and emotional conditions of the parties, the retirement benefits of the parties, the duration of their marriage, Katja's age and Brenda's current employment, and Brenda's education. R.C.3105.18(C)(1)(a)-(f),(h). Additionally, the trial court noted that there was no testimony provided with regard to the standard of living established during the marriage, the contribution of each party to the education of the other, the tax consequences of an award of spousal support and lost income production capacity. R.C.3105.18(C)(1)(g),(j)-(m). After reviewing the factors, the trial court found that spousal support was both appropriate and reasonable and awarded Christopher $300 per month for a period of five years.
 {¶ 49} Brenda makes two arguments as to why the trial court abused its discretion. In her first argument, Brenda argues that since Christopher testified that if he had more than $810 in monthly income, then he would lose some of his Social Security benefits, the trial court erred in awarding him spousal support, because it would reduce his Social Security Benefits and fails to financially benefit him. Additionally, Brenda admits that according to Christopher's 2005 tax return, *Page 20 
his adjusted gross income was $7,943.00, or approximately $661.92, a month from his current employment of ten to eleven hours a week. Accordingly, Brenda correctly notes that Christopher can receive an additional $139.00 per month before decreasing his social security benefits.
 {¶ 50} However, Brenda's argument fails to recognize that the trial court noted that Christopher has an "end stage renal disease, must have dialysis three times a week and is able to work only 10-11 hours per week * * *." (Magistrate's Decision July 6, 2006 p. 12) (emphasis added). Accordingly, we cannot find that the trial court abused its discretion in awarding spousal support, which would allow Christopher to reduce the number of hours he works.
 {¶ 51} In her second argument, Brenda argues that the trial court failed to indicate the basis for its award in sufficient detail for this Court to determine if the award is fair, equitable, and in accordance with R.C. 3105.18(C)(1). In making this argument, Brenda relies on the Ohio Supreme Court's decision in Kaechele, 35 Ohio St.3d 93, paragraph two of the syllabus, which provides:
 In allocating property between the parties to a divorce and in making an award of sustenance alimony, the trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law.
 {¶ 52} However, as noted above, the trial court reviewed the factors listed in R.C. 3105.18(C) in awarding spousal support. Additionally, Brenda does not *Page 21 
provide any reasons as to why the trial court's basis for its award of spousal support was not provided in sufficient detail to enable us to determine whether the award was fair, equitable, and in accordance with the law. Further, we were able to properly review the trial court's award of spousal support. Therefore, we find her argument to be without merit.
 {¶ 53} Finding that the trial court did not abuse its discretion in awarding spousal support to Christopher, we overrule Brenda's first assignment of error.
 Assignment of Error No. II {¶ 54} In her second assignment of error, Brenda asserts that the trial court abused its discretion for failing to qualify Dr. Nicholas as an expert witness with regard to families going through divorces with one parent who makes sexual allegations with regard to another parent where a child is involved. Specifically, Brenda argues that the trial court erred in finding that Dr. Nicholas could not be qualified as an expert, because her last training on the related subject was approximately four years old. We disagree.
 {¶ 55} Evid.R. 702, which governs the admissibility of expert testimony, states: "A witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, *Page 22 
experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information." Evid.R. 702. The proponent of the testimony bears the burden of establishing the witness' qualification.
 {¶ 56} Evid.R. 702(C) requires that an expert's testimony be based on "reliable scientific, technical, or other specialized information." "The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." State v.Nemeth, 82 Ohio St.3d 202, 211, 1998-Ohio-376. The Staff Note to Evid.R. 702 instructs that questions of reliability are to be directed at principles and methods used by an expert in reaching his or her conclusions, rather than at the correctness or credibility of the conclusions themselves. "Relevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony." Nemeth, 82 Ohio St.3d at 211; see, also, BikeAthletic, 80 Ohio St.3d at 611.
 {¶ 57} Additionally, Evid.R. 103(A)(2) provides that in order to preserve error for appeal, a proffer of the evidence that was excluded must be made on the record. Here, Brenda's counsel failed to proffer Dr. Nicholas' testimony; thus, we are unable to determine whether the excluded evidence is reliable for purposes of Evid.R. 702. *Page 23 
 {¶ 58} Accordingly, Brenda's second assignment of error is overruled.
 Assignment of Error No. III {¶ 59} In her third assignment of error, Brenda asserts that the trial court abused its discretion in granting Christopher unsupervised visitation with Katja. Specifically, Brenda argues that the trial court abused its discretion because its decision was against Christopher's own testimony that he did not believe that extended summer visitation was in Katja's best interest due to his dialysis and medical condition and the GAL's recommendation that Christopher only have supervised daytime visitation.
 {¶ 60} The Ohio Supreme Court examined visitation rights in Braatz v.Braatz, 85 Ohio St.3d 40, 45, 1999-Ohio-203, and found that R.C.3109.051(D) set forth the standard for trial courts to apply when asked to modify visitation rights. Under R.C. 3109.051(D), a trial court is permitted to modify visitation rights if it determines that the modification is in the child's best interests. In making this determination, the court is required to consider the factors laid out in R.C. 3109.051(D).
 {¶ 61} Here, we conclude that the trial court did not abuse its discretion when assigning visitation rights to Christopher. The trial court carefully reviewed and applied each of the sixteen factors stated in R.C. 3109.051(D). Additionally, in making custody decisions, the trial court has discretion to follow or reject the *Page 24 
recommendations of the guardian ad litem. Accordingly, Brenda's third assignment of error is overruled.
 {¶ 62} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW and WILLAMOWSKI, JJ., concur. *Page 1