OPINION
{¶ 1} Defendant-Appellant, Richard M. Wegmann II, appeals the judgment of the Allen County Court of Common Pleas, convicting him of one count of murder with a firearm specification. On appeal, Wegmann asserts that the trial court erred in excluding evidence and testimony of his defense expert's testing; that the trial court erred in permitting prejudicial hearsay testimony; that the trial court erred in excluding relevant circumstantial evidence; that the trial court erred in improperly and prejudicially instructing the jury on accident and foreseeability; that the prosecutor's misconduct denied his rights to due process and to a fair trial; that the trial court erred in denying his motion and supplemental motion to change venue; that the trial court erred in overruling his first motion in limine; that the trial court erred in overruling his Crim.R. 29 motions for acquittal; and, that the cumulative effect of numerous errors during the proceedings resulted in a fundamentally unfair trial. Based on the following, we affirm the judgment of the trial court.
 {¶ 2} In February 2006, the Allen County Grand Jury indicted Wegmann for one count of purposeful murder with a firearm specification in violation of R.C. 2903.02(A) following an incident whereby Wegmann shot his ex-girlfriend, Linsi Light, and fatally wounded her. Subsequently, Wegmann entered a plea of not guilty to the indictment. *Page 3 
 {¶ 3} In April 2006, Wegmann moved for a change of venue pursuant to Crim.R. 18. Additionally, Wegmann moved to suppress videotaped statements that he made to police on the date of the shooting.
 {¶ 4} In July 2006, Wegmann filed a supplemental motion for change of venue on the grounds of prejudicial pre-trial publicity and attached thirty-one newspaper articles, editorials, letters to the editor, internet postings, and internet blogs discussing the case. Wegmann also filed a supplemental motion to suppress the videotape of his statement to the police on the date of the shooting. Thereafter, the trial court postponed ruling on Wegmann's motion for change of venue and his supplemental motion for change of venue until completion of the voir dire process. Also, the trial court held a hearing regarding Wegmann's motion to suppress the videotape.
 {¶ 5} In August 2006, the trial court overruled Wegmann's motion to suppress the videotape.
 {¶ 6} In September 2006, Wegmann filed a motion in limine to exclude various evidence, including specific portions of his statement to police, wherein he stated that he had been in trouble before, described a fight he had at King's Island and a prior arrest for public intoxication, and discussed the breakup of a prior relationship. Thereafter, the trial court overruled Wegmann's motion in limine. *Page 4 
 {¶ 7} A jury trial was held from September 25 through September 30, 2006, at which the following facts were undisputed: that Wegmann and Light attended college at the OSU-Lima branch in Lima, Ohio; that Wegmann and Light lived on separate floors of the apartment building located at 1212 Bellefontaine Avenue in Lima; that, during the evening of February 12, 2006, Wegmann shot Light in her left cheek in her apartment with her 9mm semi-automatic pistol; that Wegmann voluntarily went to the police afterward; and, that Light died as a result of the gunshot. The sole issue at trial was whether Wegmann purposefully or accidentally shot Light.
 {¶ 8} During the trial, the following details surrounding the shooting were established. Wegmann and Light met and began dating sometime during late summer or early fall 2005 and had fairly free access to each other's apartments. At some point, Light began working at Legend's, a sports bar in Ottawa, and sometimes would not come home on the weekends after work. Consequently, Wegmann often called Light to see if she was coming home. In January 2006, Light's ex-boyfriend, Corey Carder, began taking classes at the OSU-Lima branch and spending more time with Light.
 {¶ 9} On or around February 3, 2006, Light broke up with Wegmann, shut him out of her apartment, and stopped speaking to him. According to Wegmann, Light wanted to separate because she wanted to have fun and go out with other *Page 5 
people, but the main reason was that she wanted to experiment with girls and was confused. That same evening, while drinking in his apartment, Wegmann shot a hole through his mattress with his handgun. Wegmann stated that he was playing with the gun by chambering bullets through it and pulled the trigger because he mistakenly thought the gun was empty. This incident, along with the breakup, upset Wegmann so he went back to his parents' residence near Dayton for a brief time. Wegmann also stated that he was so upset that Light had shut him out that he took a week off of work, slept on the floor of his apartment because sleeping in his bed reminded him of her, and broke her cell phone, which she had left in his apartment. Anne Marie Leanza and Corrin Moser, friends of Wegmann's and Light's, both testified that Wegmann said he broke Light's cell phone because Carder kept calling her.
 {¶ 10} Approximately three or four days after shutting Wegmann out, Light resumed talking to him and accompanied him to a party at the residence of his co-worker, James Weise, on or around February 7, 2006. Weise testified that Wegmann and Light got along well, acted like a newlywed couple, stayed overnight, and slept in the same bed. However, Wegmann admitted that, although they slept in the same bed, nothing sexual happened because Light said she still needed time apart. *Page 6 
 {¶ 11} On February 11, the night before the shooting, Light worked a shift at Legend's. Wegmann and Moser went to Legend's that evening to eat and left without incident after about two hours. Moser testified that Wegmann wanted to go to Legend's to check up on Light because he believed Carder might be there and that, if they saw Carder's vehicle there, Wegmann wanted to either flatten the tires or slash them. After leaving Legend's, Wegmann and Moser returned to the apartment building,[1] but Moser testified that Wegmann said he would probably go check on Light again to see where she went after work.
 {¶ 12} After work, Light went with Carder and his friend to a bar in Kalida. Around midnight, Wegmann called Light to see if she was coming home and left her a message. Around 2:24 a.m., Light returned Wegmann's call. A few minutes later, at approximately 2:29 a.m., someone got onto Light's laptop computer in her apartment, looked at a picture of Light with two other girls named "untitled.bmp", logged onto Wegmann's OSU e-mail account, and attached the picture to an email. At 2:42 a.m., someone logged onto a Yahoo account on Wegmann's desktop computer in his apartment, looked at an email, downloaded a picture identical to that sent from Light's laptop, saved it to his hard drive, and renamed it "LinsiBitch.bmp." Around 4:00 a.m., someone conducted multiple internet searches for "Corey Carder" on Wegmann's computer. According to Kevin *Page 7 
DeLong, the Lima Police Department investigator who conducted forensic examinations on Light's and Wegmann's computers and cell phones, the photo sent from Light's computer was the exact same one as that downloaded and renamed on Wegmann's because files have their own unique digital fingerprint and the odds of two files having the same digital fingerprint are nearly impossible.
 {¶ 13} Around 2:30 or 3:00 p.m. on February 12, Light took Moser to run some errands and then they returned to her apartment to eat. Moser testified that Wegmann walked into Light's apartment unannounced, spoke to Moser, and then left. When Moser left about a half an hour later, Wegmann came and asked him to go down the street with him to get some cigarettes. Moser testified that they went around 5:30 p.m.; that Wegmann seemed upset because Light was not talking to him; and, that Wegmann said he was going to his apartment to watch a movie after they returned.
 {¶ 14} At approximately 7:50 p.m., the Lima Police Department received a phone call from Wegmann about the shooting. Around the same time, the Allen County Deputy Sheriff, Brock Douglass, happened upon Wegmann in the Market Street square. Deputy Douglass testified that Wegmann was leaning against his vehicle talking on his cell phone, appeared to be upset and crying, said that he was talking to 9-1-1 and looking for the police station, told him that a gun had accidentally gone off while he was removing the magazine from it, handed him a *Page 8 
loaded 9mm magazine and some loose 9mm rounds, and said the gun was in his vehicle. Deputy Douglass also testified that Wegmann cooperated with him, obeyed his instructions, and consistently stated that the shooting was an accident. Wegmann was taken to the police station, where he voluntarily submitted to questioning about the shooting by Detectives Timothy Clark and John Bishop of the Lima Police Department.
 {¶ 15} When the police arrived at Light's apartment, they found that the door was locked; that the lights were off; that Light's body was on the floor near the entryway; that a white trash bag was underneath Light's head, a roll of paper towels was beside her, and a bottle of Windex was on top of a blanket next to her; that the couch, the floor underneath it, and the pillow on it were saturated with blood and the pillow had an indentation in it; and, that a spent 9mm bullet casing was between the seat cushions on the couch. The police subsequently retrieved a white trash bag with blood on it, a stack of trash bags, and a 9mm gun in a nylon holster from the front passenger side of Wegmann's vehicle. The gun had blood, later identified as Light's, on the right side of the slide of the gun and also had tissue matter on the front portion and inside the barrel. I.D. Officer David Hammond with the Lima Police Department testified that he processed the crime scene and concluded that Light had definitely been shot on the couch and then moved to the floor. *Page 9 
 {¶ 16} The video recording of Wegmann's interview was played for the jury.[2] During the interview, Wegmann stated that it did not bother him that Light stopped coming home on the weekends after work, hung out with Carder and other guys, and wanted to experiment with girls; that he never really considered him and Light to be broken up because they still spent time together; that, during the early morning of February 12, Light called him back to tell him she was not coming home because she was hanging out with friends; and, that he did not know Light was with Carder that evening. Later in the interview, Wegmann admitted that, during the same phone call, Light also told him that she still needed time and a break from him, but he said it was nothing new to him and did not upset him.
 {¶ 17} Wegmann further stated that unbeknownst to Light, he had taken her gun from her apartment before she broke up with him and shut him out; that Light was either not home or was asleep when he took her gun to look at it and play with it because he is fascinated with guns; that he went down to Light's apartment sometime in the evening on February 12 to return some of her clothes and items, including her loaded gun, which were in his apartment; that he placed the gun on the coffee table across from the couch; that Light was lying on the couch and he sat at the other end by her feet and they talked and watched television; that he then got onto his knees on the floor in front of Light to discuss their relationship and *Page 10 
convince her that they could work through things; that he subsequently moved to the coffee table and sat across from Light's head; that he started playing with the gun on his lap when it went off; that maybe the trigger got pulled when he was playing with the gun; and, that he did not point the gun at Light, say anything about shooting her, or intend to shoot her, because he loved her. Wegmann also stated that the gun barrel was close to Light's face when it was fired. When Detective Clark asked whether the gun barrel was inches, feet, or yards away, Wegmann replied that he was not sure but that it was more than inches away. Wegmann demonstrated the distance with his hands, to which Detective Clark replied "a couple of feet?" and Wegmann stated "yeah." (State Ex. 3, 21:55:27).
 {¶ 18} Wegmann continued that, after the gun went off, he jumped up and called his friend Patrick right away because he did not know what to do; that he told Patrick he was just going to go to the police and Patrick said that was a good idea; that, before he called Patrick, he tried to pick Light up because he did not know what to do, but he fell against the wall and laid her down; that he did not call 9-1-1 right away because he was scared and did not know what to do; that he did not call for an ambulance because he knew it was too late because Light was not responding; that he did not check Light's pulse; that he did not call the police right away because he wanted to go to them in person and explain himself instead of being taken away in handcuffs; that he locked Light's door so that no one would *Page 11 
walk in and see her that way; that he took the gun to give to the police so they would not have to look for anything; and, that he drove down the street looking for the police station, but could not find it so he called 9-1-1.
 {¶ 19} Upon further questioning, Wegmann admitted that, after attempting to pick Light up, he went to his apartment to get the cleaning supplies; that he used the paper towels to try to wipe the blood off of her first, but it did not work so he put trash bags over her face because he could not bear to look at her; that he was going to try to clean the floor with the Windex; that he put the trash bag under Light because he did not want to make a mess and did not know what to do; and, that he then called Patrick and went to find the police station.
 {¶ 20} When Detective Clark asked Wegmann to sign a consent form so police could search his apartment to corroborate his story about shooting his mattress, Wegmann hesitated, stating that he had a picture of Light on his computer named "LinsiBitch." Wegmann explained that he had saved the picture and renamed it when he was angry, but had renamed it "a while ago" when Light had shut him out. (State's Ex. 3, 23:01:30). Later in the statement, Wegmann explained that he probably had three copies of the picture because Light emailed it to him a long time ago and he emailed it to himself again later, but had never saved it; that he renamed it the day before; and, that he renamed it because he was *Page 12 
adding it to his pictures of ex-girlfriends and it was the first name that came to mind.
 {¶ 21} During the trial, it was further established that the gun was in proper working condition; that the gun could only be fired if the trigger was pulled; that between four to six and one-half pounds of pressure were required to pull the trigger; that the safety is easy to disengage; that pulling back the slide of the gun chambers a bullet; that it is possible to move the slide back and forth to pop bullets out of the gun without firing it, but the safety must be disengaged; that, when fired, the gun expels the bullet, flame, burned gunpowder soot, unburned and partially unburned gunpowder soot, and gas vapors; and, that one or more of those things may be visible on the skin depending on the range of fire.
 {¶ 22} Both parties presented expert testimony to support their version of events. Dr. Cynthia Beisser, the Deputy Coroner of Lucas County, Ohio, and the State's expert in forensic pathology, testified that she performed the autopsy of Light's body on February 13, 2006, and concluded in her report that the bullet wound on Light's cheek was a hard contact wound. Dr. Beisser explained that she had performed over five-thousand autopsies and was familiar with the trauma gunshots can cause to the body depending on the range of fire; that, if the gun muzzle is held in tight or hard contact with the skin, then burning or charring from the flame of the gun will be visible around the area where the bullet enters the *Page 13 
skin; that charring only occurs with a hard contact wound; and, that a hard contact wound also creates a "muzzle imprint" because gases from the gun go under the skin and cause the skin to punch out; that, if the barrel of the gun is in hard contact with the skin, when the skin punches out against the barrel it leaves an imprint of the barrel and creates "a rather large ugly wound." (Trial Tr., v. 3, p. 778).
 {¶ 23} Dr. Beisser continued that, when she examined Light's wound, charring was visible on the skin around the bullet hole; that it was a large ugly wound; that an imprint of the gun slide and gun frame or undercarriage was also visible; that the imprint was a "classic muzzle imprint" (trial tr., v. 3, p. 779); and, that there was no possibility that the wound was inflicted from two feet away, one foot away, an inch away, or even from a loose contact distance. The State introduced pictures of Light's wound demonstrating the charring and muzzle imprint.
 {¶ 24} Dr. Beisser further testified about how the wound would appear if it was not a hard contact wound, explaining that, if a gun is held in loose contact with the skin, which means there is a little bit of airspace between the muzzle and the skin, a ring of soot will be deposited on the skin around the wound; that, at an intermediate range, the soot will dissipate in the air before reaching the skin but the unburned or partially unburned gunpowder grains will be deposited on the skin around the bullet wound and create "stippling" or tattooing from the burning of the *Page 14 
skin; and, that, at an indeterminate range, the flame, soot, and gunpowder will dissipate in the air before reaching the skin so that only the bullet hole is visible.
 {¶ 25} Conversely, David Brundage, Wegmann's ballistics expert, concluded that Light's wound was not a hard contact wound. Brundage explained that, with a hard contact shot, soot and gunpowder material will be deposited in the wound track; that, if the soot and gunpowder is not visible in the wound track, it can be seen microscopically; and, that, when the gun is fired from very close range, the gas and pressure will cause the skin to billow and slap against the front of the muzzle and leave an imprint.
 {¶ 26} Brundage continued that, after reviewing Wegmann's statement to the police, Dr. Beisser's report finding no soot or gunpowder, and the photos of Light's wound, the crime scene, and the gun, he concluded that the markings on Light's cheek were more consistent with a near contact wound from a distance of one-half of an inch to an inch; that the farthest distance the gun could have been from Light's cheek was two to three inches given the elasticity of the cheek and the pressure from the gas vapors; that, from that distance, when the skin slaps against the muzzle, the soot and gunpowder embeds itself in the skin, blackens the skin, and will not wash away; and, that, if the wound was a hard contact wound, he would have expected to see more extensive damage to Light's cheek because a bullet fired from a 9mm gun exits at thirty-five thousand pounds of pressure. *Page 15 
 {¶ 27} To support Brundage's conclusion, Wegmann introduced a picture of human tissue depicting the amount of gunpowder and residue deposited from a distant gunshot wound and a hard contact wound, a picture of the underside of the tissue reflecting gunpowder particles in the tissue from a hard contact wound, and drawings of wound patterns from various distances.
 {¶ 28} On cross-examination, Brundage testified that he has never conducted an autopsy, but has observed them; that, with the amount of debris expelled by a 9mm gun, residue should be found inside the wound; and, that he did not contact Dr. Beisser to see why she did not find any gun residue inside the wound track, but it may have been helpful to speak with her.
 {¶ 29} At the close of both the State's case and his case, Wegmann moved for a Crim.R. 29 judgment of acquittal, which the trial court overruled.
 {¶ 30} In October 2006, the jury convicted Wegmann of one count of murder with a firearm specification as charged in the indictment. Subsequently, the trial court sentenced Wegmann to an indefinite prison term of fifteen years to life for the murder conviction and to a three-year prison term for the firearm specification, to be served consecutively for an aggregate prison term of eighteen years to life.
 {¶ 31} It is from this judgment that Wegmann appeals, presenting the following assignments of error for our review. *Page 16 
 Assignment of Error No. I THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE AND TESTIMONY OF THE DEFENSE EXPERT'S TESTING THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. II THE TRIAL COURT ERRED IN PERMITTING PREJUDICIAL HEARSAY TESTIMONY, THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. III THE TRIAL COURT ERRED IN EXCLUDING RELEVANT CIRCUMSTANTIAL EVIDENCE REGARDING THE PARTIES (SIC) RELATIONSHIP AND CORROBORATIVE OF THE DEFENDANT'S STATEMENT TO POLICE THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. IV THE TRIAL COURT ERRED IN IMPROPERLY AND PREJUDICIALLY INSTRUCTING THE JURY ON ACCIDENT AND FORESEEABILITY, THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS *Page 17 OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. V THE MISCONDUCT OF THE PROSECUTOR DENIED APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. VI THE TRIAL COURT ERRED IN DENYING THE MOTION AND SUPPLEMENTAL MOTION TO CHANGE VENUE THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.
 Assignment of Error No. VII THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S FIRST MOTION IN LIMINE AND PERMITTING IRRELEVANT AND PREJUDICIAL EVIDENCE FROM DEFENDANT'S STATEMENT TO POLICE, THEREBY DENYING APPELLANT WEGMANN HIS RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. *Page 18 
 Assignment of Error No. VIII THE TRIAL COURT ERRED BY OVERRULING APPELLANT WEGMANN'S CRIMINAL RULE 29 MOTIONS FOR ACQUITTAL, THEREBY DENYING MR. WEGMANN HIS RIGHTS AS GUARANTEED TO HIM BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I OF THE OHIO CONSTITUTION.
 Assignment of Error No. IX THE CUMULATIVE EFFECT OF NUMEROUS ERRORS OCCURRING DURING THE PROCEEDINGS RESULTED IN A FUNDAMENTALLY UNFAIR TRIAL.
 {¶ 32} For ease of analysis, we elect to address Wegmann's assignments of error out of order and grouped by topic.
 Venue {¶ 33} In his sixth assignment of error, Wegmann asserts that the trial court denied him his Sixth and Fourteenth Amendment rights under the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution by overruling his motions for change of venue. Specifically, Wegmann contends that the nature of the pretrial publicity, as well as the fact that some of the jurors had admittedly been exposed to the publicity, was so prejudicial as to warrant a change of venue. We disagree.
 {¶ 34} A trial court's ruling on a motion for change of venue will not be disturbed on appeal absent an abuse of discretion. State v.Roberts, *Page 19 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 116. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.
 {¶ 35} A change of venue should not automatically be granted when extensive pretrial publicity exists. State v. Frazier,115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 235. "Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial."Roberts, 110 Ohio St.3d at ¶ 117, citing Nebraska Press Assn. v.Stuart (1976), 427 U.S. 539, 554. Instead, a "`defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased.'" Frazier, 115 Ohio St.3d at ¶ 235, quoting State v. Gross, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 29. "Only in rare cases may prejudice be presumed." Roberts, 110 Ohio St.3d at ¶ 117, citing State v. Treesh (2001), 90 Ohio St.3d 460, 464,2001-Ohio-4. Moreover, the Supreme Court of Ohio has long held "that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community." Roberts, 110 Ohio St.3d at ¶ 116, referencing State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 35,State v. *Page 20 Landrum (1990), 53 Ohio St.3d 107, 117, and State v. Swiger (1966),5 Ohio St.2d 151, paragraph one of the syllabus.
 {¶ 36} During the voir dire process, the trial court pooled the prospective jurors into small groups of five people, brought each group in separately for voir dire examination, questioned each group about pretrial publicity, and then allowed each party to question the prospective jurors. The trial court immediately dismissed six of the prospective jurors for cause because they admitted that they could not be impartial to Wegmann. Thereafter, the State exercised three of its peremptory challenges to excuse prospective jurors and Wegmann exercised all four of his peremptory challenges. Of the final twelve jurors, nine had either heard nothing about the case or had only heard very little. Of the three jurors who had heard about the case, one heard about it in the media around the time the shooting occurred, had not discussed or heard anything about it since, and considered Wegmann to be innocent until proven guilty; one heard about the case on the news when it occurred, had not heard anything since, and had never read anything about it in the newspaper; and, one heard about the case when it happened but did not formulate an opinion on it. All three jurors indicated that they could be impartial.
 {¶ 37} Here, Wegmann argues that he was prejudiced by the trial court's refusal to grant him a change of venue given the extensive pre-trial publicity and *Page 21 
the fact that some of the jurors admitted to hearing about the case from the media. However, in accordance with Roberts, supra, the trial court appropriately held the issue in abeyance until it could conduct the voir dire. The trial court conducted a thorough, careful voir dire of the jury pool by breaking it into small groups, by conducting its own inquiry regarding pretrial publicity, immediately dismissing those jurors who admitted they could not be fair and impartial, and by allowing the parties to conduct their own inquiry of the prospective jurors. Nine of the final twelve jurors had never heard about the case or heard very little, and the three jurors who did indicated that they had not formulated an opinion and would be impartial.
 {¶ 38} Moreover, aside from making general assertions, Wegmann has failed to demonstrate that any of the jurors were actually biased, as required by the Supreme Court of Ohio. See Frazier, supra (affirming trial court's denial of defendant's motion for change of venue in capital murder case where trial court questioned prospective jurors about pretrial publicity, nine jurors had not heard about case, and the remaining three indicated that the publicity would have no effect on their ability to be impartial) and Roberts, supra (affirming trial court's denial of defendant's motion for change of venue in capital murder case because the trial court had conducted a thorough voir dire, nine of the jurors had not heard about the case, and the fact that three jurors had heard about some aspects of the *Page 22 
case did not necessarily reflect bias or lack of impartiality). Thus, we find that the trial court did not abuse its discretion in overruling Wegmann's motions for change of venue.
 {¶ 39} Accordingly, we overrule Wegmann's sixth assignment of error.
 Evidentiary Matters Standard of Review {¶ 40} Trial courts have broad discretion in determining whether to admit or exclude evidence. Deskins v. Cunningham, 3d Dist. No. 14-05-29,2006-Ohio-2003, ¶ 53, citing Huffman v. Hair Surgeons, Inc. (1985),19 Ohio St.3d 83. Accordingly, a trial court's ruling on the admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. Id. See, also, Miller v. Bike Athletic Co.,80 Ohio St.3d 607, 616, 1998-Ohio-178 (admissibility of expert testimony will not be disturbed absent abuse of discretion); State v. Robb, 88 Ohio St.3d 59,68, 2000-Ohio-275 (decision to admit or exclude relevant evidence will not be disturbed absent abuse of discretion); State v. Yohey (1996), 3d Dist. No. 9-95-46, 1996 WL 116144, referencing State v. Graham (1979),58 Ohio St.2d 350 and State v. Lundy (1987), 41 Ohio App.3d 163 (ruling on motion in limine is decision to admit or exclude evidence and, therefore, subject to abuse of discretion standard). *Page 23 
 {¶ 41} Additionally, any error in the admission or exclusion of evidence will be considered harmless error unless it affects a substantial right of the accused. State v. Condon (2003),152 Ohio App.3d 629, 655, ¶ 80; Crim.R. 52(A); Evid.R. 103(A). Nonconstitutional error is harmless if "`there is substantial evidence to support the guilty verdict even after the tainted evidence is cast aside.'"State v. Harding, 2d Dist. No. 20801, 2006-Ohio-481, at ¶ 24, quotingState v. Cowans (1967), 10 Ohio St.2d 96, 104; see, also, State v.Fawcett, 3d Dist. No. 13-99-14, 2001-Ohio-2167, citing State v.Webb (1994), 70 Ohio St.3d 325, 335.
 {¶ 42} Conversely, constitutional error can only be deemed harmless if a review of the remaining evidence indicates overwhelming evidence of the defendant's guilt and must be harmless beyond a reasonable doubt.Harding, 2006-Ohio-481, at ¶ 24 (citations omitted); State v. Davis
(1975), 44 Ohio App.2d 335, 346. Nonconstitutional error may rise to the level of constitutional error where such error amounts to "a violation of the appellant's right to a fair trial as that term is understood under the due process clause of the Fourteenth Amendment," in which case the test for harmless constitutional error applies. Davis,44 Ohio App.2d at 348. As Wegmann asserts that he was deprived of a fair trial, we apply the more stringent constitutional error standard. *Page 24 
 Expert Testimony {¶ 43} In his first assignment of error, Wegmann asserts that the trial court erred in excluding evidence and testimony of his expert's firearms testing on a chicken. Specifically, Wegmann contends that the chicken was substantially similar to human tissue and that the testing was relevant, reliable, and corroborative of Wegmann's accident defense. We disagree.
 {¶ 44} Evid.R. 702 governs the admissibility of expert testimony and provides, in pertinent part:
 A witness may testify as an expert if all of the following apply:
 * * *
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
Evid.R. 702(C) (emphasis added). The party seeking to admit expert testimony bears the burden of establishing the witness' qualifications.Crawford v. Crawford, 3d Dist. No. 14-06-42, 2007-Ohio-3139, ¶ 55. *Page 25 
 {¶ 45} In determining whether an expert's testimony is reliable, courts must focus their inquiry "on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." Miller v. Bike Athletic Co., 80 Ohio St.3d 607,1998-Ohio-178, at paragraph one of the syllabus (adopting standard and factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc.
(1993), 509 U.S. 579). Additionally, to be admissible, the expert testimony must also assist the trier of fact in determining a fact issue or understanding the evidence. Miller, 80 Ohio St.3d at 611 (citations omitted).
 {¶ 46} In evaluating the reliability of scientific evidence, the following factors should be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. Id., citingDaubert, 509 U.S. at 593-94. Although these factors aid in determining reliability, they are not prerequisites to admissibility and the inquiry remains flexible. Id. at 611-613. Thus, the "`ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" Id. at 614, quoting DeLuca v. Merrell Dow Pharmaceuticals,Inc. (C.A.3, 1990), 911 F.2d 941, 956, (citation omitted). *Page 26 
 {¶ 47} Additionally, regarding out-of-court experiments in particular, evidence "`tending to prove or disprove a contention in issue is admissible if there is a substantial similarity between conditions existing when the experiments are made and those existing at the time of the occurrence in dispute; dissimilarities, when not so marked as to confuse the jury, go to the weight rather than the admissibility of the evidence.'" Miller, 80 Ohio St.3d at 614, quoting St. Paul Fire MarineIns. Co. v. Baltimore Ohio RR. Co. (1935), 129 Ohio St. 401, at paragraph one of the syllabus.
 {¶ 48} During his testimony, Brundage began to explain the impact of gunshots from various distances upon human tissue, at which point the State challenged his qualifications to do so. While establishing his qualifications outside the presence of the jury, Brundage stated that he was not trained to conduct autopsies and had never conducted one, but had observed them and trained with forensic pathologists; that he conducts laboratory testing on tissue similar to human tissue in order to simulate gunshot wounds; that he conducted gunfire testing on a chicken from a hard contact distance and a distance of one-half of an inch to an inch; and, that he used a chicken because, "[i]n an effort to try and find as close of a material as possible to the thickness of a human cheek there is an area on a fowl that's very thin, contains no bone, has a cavity inside as the fowl is prepared." (Trial Tr., v. 5, p. 981). *Page 27 
 {¶ 49} Thereafter, the trial court found that Brundage was qualified as an expert to testify about firearms, gunpowder patterns, and wounds in general, but that Wegmann presented insufficient evidence to support the reliability of the testing because it was "comparing apples and oranges or in different situation (sic.) those test results have no bearing in this case. They aren't reliable." (Trial Tr., v. 5, p. 986). The trial court further explained that Brundage "may render an opinion for the jury if he has one relative to what he believes — what general powder burns — distance. * * * He cannot refer to a chicken or a test that may have had or may not have had or has no bearing under the — on the — on reliability, whether it's conducted, rate of error and all that under Daubert. I don't think that's proper." (Trial Tr., v. 5, pp. 986-87). The trial court also excluded the photos of the chicken depicting the amount of gunpowder and soot from the two distances.
 {¶ 50} Consequently, Wegmann proffered Brundage's excluded testimony, in which he concluded that the hard contact shot to the chicken left a large deposit of gunpowder and soot, whereas the shot from one-half of an inch away barely left a deposit; that neither shot duplicated the photos of Light's wound because the shots tore the chicken tissue apart and made large cavities; but, that the testing did demonstrate the large amount of pressure coming from the gun. *Page 28 
 {¶ 51} Here, the trial court essentially found that a chicken was not substantially similar to human tissue to warrant admittance of the test results and photos. We agree with Wegmann that, based upon Brundage's explanation, a specific area of the chicken probably is substantially similar to a human cheek and that any dissimilarities would go to the weight of the evidence rather than the admissibility. However, dissimilarity was not the trial court's sole reason for the exclusion of the testing. The trial court also noted that the testing was not reliable based on the Miller and Daubert factors. A review of the record indicates that Wegmann did not address any of the four Miller factors in attempting to establish the reliability of the testing. While it is not a requirement that all four factors be met, the record is completely devoid of any evidence presented to demonstrate that testing on animals in order to duplicate human flesh wounds is a tested theory, is a technique that has been subjected to peer review, has a known or potential rate of error and, if so, what the rate of error is, or is a technique that has gained general acceptance in the field of ballistics. See, e.g., Miller, supra (expert's testing on football helmet admissible where evidence presented that the testing was conducted according to national operating standards and that publications supported expert's theory); State v. Harvey (1997), 11th Dist. No. 95-L-192, 1997 WL 269195
(while not directly at issue, ballistics expert's testing on blocks of ordnance gelatin admissible where substance also used by army to test *Page 29 
performance characteristics of projectiles); Roberts v. State (Fla.App. 1966), 189 So.2d 543 (ballistics expert's testing on manila paper not admissible where expert admitted that paper not sufficiently similar to human skin). Thus, we find that the trial court did not abuse its discretion in excluding both Brundage's testimony about the testing and the accompanying photos.
 {¶ 52} Even if we were to find that the trial court erred in excluding Brundage's testimony about the testing results and photos, such error would be harmless. Brundage's proffered testimony indicated that he would have noted that more gunpowder soot and residue was deposited in the cavity of the chicken from the hard contact shot than the near contact shot, which is exactly what he testified to and displayed using the human tissue photos depicting the amount of gun powder left by a hard contact shot versus a near contact shot. Additionally, Brundage was able to give his opinion and rationale for his belief that Light's wound was the result of a near contact shot from one-half of an inch to an inch away, not from a hard contact shot.
 {¶ 53} Accordingly, we overrule Wegmann's first assignment of error.
 Motion in Limine {¶ 54} In his seventh assignment of error, Wegmann asserts that the trial court erred in overruling his first motion in limine and permitting irrelevant and prejudicial evidence from his statement to the police. *Page 30 
 {¶ 55} A motion in limine is a request "that the court limit or exclude use of evidence which the movant believes to be improper, and is made in advance of the actual presentation of the evidence to the trier of fact, usually prior to trial. The motion asks the court to exclude the evidence unless and until the court is first shown that the material is relevant and proper." State v. Winston (1991), 71 Ohio App.3d 154,158; see, also, State v. Grubb (1986), 28 Ohio St.3d 199, 203.
 {¶ 56} In general, "[evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).
 {¶ 57} During the police interview, Detective Clark informed Wegmann that, although Wegmann came to the police voluntarily, he would feel more comfortable reading Wegmann his rights, to which Wegmann replied "[i]t's not the comfortable factor. I've been in trouble before. If they don't read you your rights you can't get in trouble basically." (State Ex. 3, 21:26:33). Wegmann later explained that, when he was a minor, he had gotten in trouble for being drunk at a Fourth of July party; that, on a separate occasion, he had gotten into a fight with a security guard at King's Island; that his mother had given him Klonapin, a depression reliever, after he and his girlfriend of two years broke up because it *Page 31 
was hard on him for six months; and, that he talked to a psychologist about the breakup.
 {¶ 58} Here, Wegmann contends that his statements regarding his arrest for public intoxication and the fight with the security guard, as well as his comment that he had been in trouble before, were irrelevant and should have been redacted from the video. Additionally, Wegmann argues that his discussion about his prior breakup, use of Klonopin, and treatment from a psychologist were unfairly prejudicial and should have been redacted. We agree that the trial court should not have admitted any of this information. The public intoxication and fight incidents occurred when he was a minor and bore no relevance to his relationship with Light or whether he purposely killed her in February 2006. Likewise, his statement that he had been in trouble before, presumably referring to the public intoxication and fight incidents, was irrelevant. Additionally, Wegmann's discussion about his prior breakup and subsequent treatment for it, although relevant, was improper character evidence used by the State to show that, because Wegmann had difficulty handling a past breakup, he could not handle his breakup with Light and shot her. It was not used for any other purpose. Thus, we find that the trial court erred in admitting these portions from the police video.
 {¶ 59} However, after reviewing the record, we find that the error was harmless beyond a reasonable doubt. Aside from Wegmann's brief comments *Page 32 
regarding the public intoxication and fight, these incidents were never brought up again throughout the extensive five-day trial. Moreover, although the State did consistently emphasize Wegmann's prior breakup, overwhelming evidence existed to support Wegmann's conviction independent of the improper evidence.
 {¶ 60} For instance, many of Wegmann's statements to the police were contradictory and conflicted with the forensic evidence. Wegmann gave four different accounts of what he was doing with the gun when it was fired: first, he told Deputy Douglass that he was removing the magazine clip from the gun when it accidentally went off; next, he told Detective Clark that he was chambering the bullets through the gun when it went off; later, he indicated to Detective Clark that he was holding the gun in his right hand and was turning his hand back and forth when the gun went off; and, finally, he told Detective Clark that he was just looking at the gun and playing with the rubber grip on it when it went off. Wegmann also continuously stated that the gun just "went off while he was playing with it, implying that the gun malfunctioned. However, it was clearly established at trial that the gun was working properly and could only have fired if the trigger was pulled. Although Wegmann did admit that he might have accidentally pulled the trigger, four to six and a half pounds of pressure were required to do so, which indicates the trigger was not sensitive to bumping or jostling. *Page 33 
 {¶ 61} Additionally, Wegmann makes much of the fact that Brundage concluded that Wegmann fired the gun from a distance of one-half of an inch to an inch away from Light's face. We fail to see how "playing" with a gun a mere one-half of an inch to an inch from someone's face is consistent with an accident. Even assuming this to be true, the location of the blood on the couch, as seen in the photos of the crime scene, is inconsistent with Wegmann's story. The bottom-left corner of the pillow was saturated in blood, as was the back portion of the right seat cushion along the area where the seat cushion meets the back cushion. See State's Exs. 12, 14, 16. If, as Wegmann asserts, he was sitting on the coffee table one and a half feet away and leaning over playing with the gun in his lap, in order for the gun barrel to be a mere one-half of an inch to one inch away from Light's cheek when it was fired, her face would have had to be near the outside edge of the couch, not near the back where the blood was located. Likewise, Wegmann's demonstration on the video of the distance between the gun barrel and Light's face was well over a foot, which was inconsistent with both his own expert's testimony and Dr. Beisser's.
 {¶ 62} Moreover, Wegmann's insistence that he was not bothered by the fact that Light stopped coming home from work on the weekends, wanted to experiment with girls, and hung out with Carder and other guys, was inconsistent with his statements that he was so upset over the breakup that he could not work *Page 34 
for a week, could not sleep in his bed, and shot a hole in his bed the night she broke up with him. It was also inconsistent with Moser's testimony that Wegmann wanted to go to Legend's on February 11 to check up on Light and to slash Carder's tires if he was there.
 {¶ 63} Further, the forensic evidence that someone, presumably Wegmann, entered Light's apartment only a few minutes after she called him back at 2:24 a.m. to tell him she did not want to be with him, downloaded and emailed a picture of her to his Yahoo account, saved it as "LinsiBitch.bmp" on his computer, and then conducted internet searches for "Corey Carder" contradicts Wegmann's statements that he was not worried about Carder, did not know Light was with Carder the night before the shooting, and had renamed the picture of her on his computer around the time she first shut him out of her apartment. All of this, coupled with Dr. Beisser's testimony and the fact that Wegmann did not call the police or an ambulance right away, moved Light's body, placed a trash bag under her head, and attempted to clean up the scene, constitutes overwhelming evidence supporting his conviction for murder.
 {¶ 64} Accordingly, we overrule Wegmann's seventh assignment of error.
 Hearsay {¶ 65} In his second assignment of error, Wegmann asserts that the trial court erred in permitting prejudicial hearsay testimony in violation of his rights to *Page 35 
due process and to a fair trial. Specifically, Wegmann contends that the trial court erred in ruling that hearsay statements made by Light to Victor Guitron, her co-worker and friend, Carder, and Moser regarding her relationship with Wegmann were admissible.
 {¶ 66} Hearsay statements are out-of-court statements made by a declarant, which are then "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 802 mandates that hearsay is inadmissible unless an appropriate exception applies, such as the present sense impression, excited utterance, or state of mind exceptions.
 {¶ 67} Evid.R. 803(1) defines a present sense impression as a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate a lack of trustworthiness." This hearsay exception is based on the premise that "`statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of trustworthiness.'"State v. Dixon, 152 Ohio App.3d 760, 2003-Ohio-2550, at ¶ 12, quotingCox v. Oliver Machinery Co. (1987), 41 Ohio App.3d 28, 35.
 {¶ 68} Similarly, Evid.R. 803(2) defines an excited utterance as a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." To be admissible as an *Page 36 
excited utterance, a statement "must concern `some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made `before there had been time for such nervous excitement to lose a domination over his reflective faculties.'" State v. Huertas (1990),51 Ohio St.3d 22, 31, quoting Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus; see, also State v. Wallace (1988),37 Ohio St.3d 87, 88 (excited utterance is a spontaneous and sincere response produced by an external shock).
 {¶ 69} Evid.R. 803(3) provides an exception to the hearsay rule for statements reflective of "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)[.] * * *" Thus, statements relating to past conduct or events do not fit within the state of mind exception. State v. Leonard, 104 Ohio St.3d 54,2004-Ohio-6235, at ¶ 108. Moreover, witnesses are not permitted to give the underlying reason why the declarant held a particular state of mind. Id. at ¶ 101.
 {¶ 70} During the trial, Guitron testified that he and Light worked until about 11:00 p.m. the night before the shooting; that, after work, Light left with Carder; that Light said she was going to come to his house afterward if she was too drunk to drive home and to avoid dealing with Wegmann; and, that Light said *Page 37 
she told Wegmann their relationship was over, but Wegmann kept calling her and she ignored his calls. Over Wegmann's objection, the trial court allowed Guitron's testimony regarding Light's statements as indicative of her state of mind or as present sense impressions.
 {¶ 71} Carder testified that, on the evening of February 11, he picked Light up from work and then picked up another friend to go to a bar in Kalida; that, on the way to the bar, Wegmann called Light; that they left the bar around 2:00 a.m.; that, in the car, Light called Wegmann back and told him to quit calling her and that she did not want to talk to him again; that Light had her phone on speaker mode and he heard Wegmann yelling, asking "why?", and asking if Carder was with her; and, that Light replied "so" or "why," Wegmann yelled "whatever" and hung up (trial tr., v. 2, p. 398). Over Wegmann's objection, the trial court allowed Carder's testimony regarding Light's statements as present sense impressions or excited utterances.
 {¶ 72} Moser testified that Wegmann's and Light's relationship deteriorated and they broke up around the first weekend of February 2006 because Light wanted to be single and hang out with her friends; that Wegmann was upset about the breakup and asked him to talk to Light, which he did; that Light indicated that she broke up with Wegmann because he constantly called and checked up on her and she got tired of it; and, that he received a phone call from Light around 3:00 *Page 38 
a.m. on February 12 and she told him she had called Wegmann, broken up with him, and was happy about it. Over Wegmann's objection, the trial court allowed Moser's testimony regarding Light's statements as indicative of her state of mind.
 {¶ 73} Here, we find that none of Light's statements to Guitron, Carder, or Moser meets the pertinent hearsay exceptions relied upon by the trial court. Regarding the present sense impression exception, Light's statements to Guitron and Carder were not made during the course of perceiving or observing an event or condition or immediately thereafter. Likewise, Light's statements to Guitron and her statements overheard by Carder do not meet the excited utterance exception because her breakup with Wegmann does not rise to the level of being so startling or shocking as to produce a spontaneous statement. Nor can we say that Light's statements to Guitron or Moser were reflective of her state of mind given they related to past conduct, not to current or future conduct. Although the portion of Light's statement to Guitron reflecting her intent to stay at his residence was admissible, her underlying reason for staying — to avoid Wegmann — was not and should have been excluded. Similarly, while Light's statement to Moser that she was happy was admissible under the state of mind exception, the underlying reason — another breakup with Wegmann — was not properly admissible. Based on the above, we find that the trial court erred by admitting Light's hearsay statements to Guitron, Carder, and Moser. *Page 39 
 {¶ 74} However, we also find that the trial court's errors were harmless beyond a reasonable doubt. As noted above, overwhelming evidence existed to support Wegmann's conviction independent of the improper evidence. Moreover, evidence cumulative to these statements was properly admitted, including: Wegmann's statement to police admitting that, when Light called him back the early morning of February 12, she informed him that she still wanted time apart; Wegmann's statements that he used to call Light to check whether she was coming home and that they separated because she wanted to be single and hang out with other people; and, a copy of Light's internet chat log from February 4, 2006, in which she stated that she broke up with Wegmann because she could not "take his I know everything attitude." Def Ex. J.
 {¶ 75} Accordingly, we overrule Wegmann's second assignment of error.
 Circumstantial Evidence {¶ 76} In his third assignment of error, Wegmann asserts that the trial court erred in excluding relevant circumstantial evidence regarding his relationship with Light and corroborative of his statement to police. We disagree.
 {¶ 77} "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. All relevant evidence is admissible unless its probative value is substantially *Page 40 
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Evid.R. 403(A). In such a case, Evid.R. 403(A) mandates exclusion of the evidence. However, where the probative value of the evidence is "substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence," the trial court retains discretion whether to exclude the evidence. Evid.R. 403(B).
 {¶ 78} During the trial, the trial court excluded the following defense exhibits on the grounds that they were either irrelevant, cumulative, not authenticated, or a combination of these reasons: print outs of text messages found on Light's cell phone that said "I miss you" and "You aren't coming home tonight I guess"; a term paper dated October 10, 2005, found on Light's computer, in which she described moving away from home and meeting Wegmann; chat logs from Light's computer in fall and winter 2005 discussing her relationship with Carder; chat logs from Light's computer in January 2006 discussing an incident where Wegmann got angry after coming home and finding Carder and Light studying together; an email on Light's computer from one of her male friends asking about Carder; a list of internet searches conducted on Light's computer, which included searches for "gender bending," "drag queens," and "mental breakdown of drag queens" in October 2005 and a search for "beastiality" and "sodomy" in December 2005; photos found on Light's cell phone, including one *Page 41 
of Wegmann and one of Carder; Halloween, Thanksgiving, and Valentine cards sent to Light from Wegmann's parents; the Wegmann family's Christmas 2005 video; and, a note to Wegmann from his father, found in Light's apartment, in which Wegmann's father advised him to consider a criminal justice degree since he had an interest in guns.
 {¶ 79} Here, Wegmann argues that these exhibits were erroneously excluded because they demonstrated that he had a loving relationship with Light and corroborated his explanation of the shooting. However, our review of each exhibit indicates that the trial court did not err in excluding them. Introduction of the text messages on Light's cell phone would have been cumulative because DeLong testified that he found the messages "I miss you" and "you aren't coming home tonight I guess" on Light's cell phone and that he found outgoing text messages saying "I miss you beautiful" and "you aren't coming home tonight I guess" on Wegmann's cell phone. Wegmann also introduced a letter he wrote to Light, presumably around the time of their initial breakup, in which he apologized, said that he still loved her, and was headed to Dayton because he had nothing going for him in Lima.
 {¶ 80} Likewise, introduction of Light's fall term paper, the holiday cards from Wegmann's family, the Wegmann Christmas 2005 video, and Wegmann's letter from his father would have been cumulative because numerous witnesses *Page 42 
testified that Wegmann and Light had a loving relationship while they were a couple, Wegmann's father testified that his wife sent Light cards, Wegmann's father and sister both testified that their family Christmas 2005 celebration was recorded and that Wegmann always had an interest in guns, and Moser, Carder, and Wegmann's sister all testified that Wegmann had shown them his and Light's guns on at least one occasion.
 {¶ 81} Moreover, the various chat logs and the email from fall 2005, as well as the January 2006 chat log discussing Carder, bore little, if any, relevance to the status of Light's relationship with Wegmann in February 2006 and were also cumulative of witness testimony. Regarding the internet searches conducted on Light's computer, there is nothing in the record to indicate that Light, and not someone else, actually conducted the searches or how the few searches at issue are even relevant, especially since over seventy-five searches were conducted on various topics including movies, "hot guys," tattoos, baby names, Ohio assault laws, and "scientific names of plants." (Def Ex. L). Although Wegmann asserts that they corroborated his assertion that he and Light were having problems because she was bisexual and not because she wanted to see other guys, we fail to see how internet searches for drag queens, bestiality, and sodomy bear any relevance to the issue of bisexuality. Also, evidence corroborating Wegmann's *Page 43 
assertion was admitted because his sister testified that Light called her to discuss bisexuality.
 {¶ 82} Additionally, Wegmann failed to either authenticate the photos of him and Carder found on Light's cell phone, or to demonstrate their relevance to the issues in this case. For all of these reasons, we find that the trial court did not abuse its discretion in excluding any of the circumstantial evidence submitted by Wegmann.
 {¶ 83} Accordingly, we overrule Wegmann's third assignment of error.
 Motions for Acquittal {¶ 84} In his eighth assignment of error, Wegmann asserts that the trial court erred by overruling his Crim.R. 29 motions for acquittal. Specifically, Wegmann contends that the State failed to prove beyond a reasonable doubt that he purposefully shot Light because the State's expert admitted that contact shots leave soot and gunpowder in a wound track; that she did not find any soot or gunpowder in the wound track; and, that the angle of the wound track was consistent with an accidental shooting from the coffee table. We disagree.
 {¶ 85} Under Crim.R. 29, a trial court, on a defendant's motion or its own motion, "after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." *Page 44 
Crim.R. 29(A). However, a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v. Bridgeman (1978),55 Ohio St.2d 261. A motion for acquittal tests the sufficiency of the evidence. State v. Miley (1996), 114 Ohio App.3d 738, 742.
 {¶ 86} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Monroe, 105 Ohio St.3d 384, 392, 2005-Ohio-2282, citingState v. Jenks (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in State v.Smith, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. State v. Robinson (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated inSmith, supra.
 {¶ 87} The State charged Wegmann with murder in violation of R.C.2903.02(A), which provides that "[n]o person shall purposely cause the death of another." "A person acts purposely when it is his specific intention to cause a certain result." R.C. 2901.22(A). Further, purpose or intent "need not be proven *Page 45 
by direct testimony." State v. Stallings, 89 Ohio St.3d 280, 290,2000-Ohio-164, citing State v. Lott (1990), 51 Ohio St.3d 160, 168. Instead, "intent to kill `may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.'" Stallings, 89 Ohio St.3d at 290, quotingState v. Robinson (1954), 161 Ohio St. 213, at paragraph five of the syllabus.
 {¶ 88} On cross-examination, Dr. Beisser testified that, after the bullet entered Light's left cheek, it traveled upward and backward severing her brain stem, fracturing her skull, and ultimately lodging in her skull behind her right ear; that the wound track, but not the wound, was consistent with the angle of firing from someone sitting on the coffee table next to the couch; that she is not a ballistics expert; that she noted in her autopsy report that no soot was visible in the wound track and no gunpowder stippling or soot was deposited in the wound; that she did not agree that soot and gunpowder are always visible in a hard contact wound; and, that she determines on a case by case basis whether microscopic examination of tissue is necessary, but it was not necessary in this case.
 {¶ 89} On redirect examination, Dr. Beisser testified that blood, especially a large amount, can obscure or obliterate any signs of soot or gunpowder deposit in a wound and that her conclusions regarding Light's wound were part of "fairly basic" pathology training. (Trial Tr., v. 3, p. 812). *Page 46 
 {¶ 90} On re-cross examination, Dr. Beisser explained that she did not need to examine the wound tissue microscopically to search for soot and gunpowder residue because it was "so clearly a [hard] contact wound that [she] really didn't have to confirm that again." (Trial Tr., v. 3, p. 814).
 {¶ 91} A close review of the record indicates that Dr. Beisser did not, in fact, state that no soot or gunpowder was present in the wound track. Instead, Dr. Beisser noted, in both her autopsy report and her testimony, that no soot or gunpowder was visible in the wound track. Dr. Beisser explained that a vast quantity of blood, as was present here, can obscure the visibility of such residue in the wound track, but that microscopic testing can reveal its presence, which Wegmann's own expert corroborated in his testimony. Thus, contrary to Wegmann's assertion, Dr. Beisser's testimony that hard contact shots will deposit soot and gunpowder in the wound track does not contradict her testimony that the soot and gunpowder was not visible in this case. Although Dr. Beisser did not perform microscopic testing to confirm the presence of soot and gunpowder in the wound track, she explained that she did not need to do so because it was obvious that Light's wound was a hard contact wound due to the "classic" muzzle imprint on Light's cheek and the charring on her skin. Brundage's testimony to the contrary involved a credibility determination best resolved by the jury as the trier of fact. SeeState v. Awan (1986), 22 Ohio St.3d 120, 123. *Page 47 
 {¶ 92} Likewise, Dr. Beisser's agreement with Wegmann's counsel that the angle of the wound track — left to right, upward and backward — could be consistent with an accidental gunshot fired from the vicinity of the coffee table does not demonstrate that the State failed to prove Wegmann purposely shot Light. Dr. Beisser was adamant that, while the path of the bullet through Light's cheek and head could be consistent with Wegmann's accident theory, the point of entry of the bullet — the wound itself — was inconsistent with an accidental shooting, even from a close distance of one-half of an inch to an inch. Again, Brundage's conflicting testimony regarding the distance from which the gun was fired involved a credibility determination to be resolved by the jury.
 {¶ 93} Moreover, as we noted in our disposition of Wegmann's seventh assignment of error, overwhelming evidence was presented which could support a jury's finding that Wegmann purposely killed Light. Thus, viewing the evidence in a light most favorable to the prosecution, we find that the trial court appropriately overruled Wegmann's Crim.R. 29 motions for acquittal because a rational trier of fact could have found beyond a reasonable doubt that Wegmann purposely caused Light's death.
 {¶ 94} Accordingly, we overrule Wegmann's eighth assignment of error. *Page 48 
 Prosecutorial Misconduct {¶ 95} In his fifth assignment of error, Wegmann asserts that the prosecutor's misconduct denied his rights to due process and a fair trial. Specifically, Wegmann contends that the prosecutor improperly and prejudicially went beyond the evidence during his rebuttal statement and urged a conviction based upon public demand. We disagree.
 {¶ 96} The test for prosecutorial misconduct during closing arguments is whether the remarks made by the prosecutor were improper, and, if so, whether they prejudicially affected a substantial right of the accused.State v. White, 82 Ohio St.3d 16, 22, 1998-Ohio-363. In making closing remarks, prosecutors are entitled to some latitude regarding what the evidence has shown and the inferences that can be drawn. State v.Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81. Furthermore, a prosecutor's closing argument must be reviewed in its entirety. Id. If, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments, then the trial will not be deemed unfair.State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417, at ¶ 45, citingState v. Treesh, 90 Ohio St.3d 460, 464, 2001-Ohio-4. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶ 140, citation omitted. *Page 49 
 {¶ 97} During the State's rebuttal portion of its closing argument, the prosecutor stated that he also teaches and had discussed the case with his class, after which the following exchange occurred:
 Prosecutor: I explained to them, you know, about the situation of this case, that a young girl, college student had been shot in the face with a gun against her head. And they said, well then he called 9-1-1. No.
 Wegmann's Counsel: Again, we're going to object and ask that this be stricken and the jury disregard it * * *. The Court: He's giving an example. [The jury's] not to read any inference of guilt or innocence from this. You may proceed. Prosecutor: You know what? You get the idea. Walk in your mind through each and every step of what happens and ask yourself, oh, and then he called 9-1-1. No. He didn't do that.
(Trial Tr., v. 5, p. 1117). The prosecutor also stated that Dr. Beisser concluded at the time of the autopsy that Light's wound was a hard contact wound, did not make it up during trial, and any suggestion that she was lying was an insult to the court; that Wegmann did not go to the police until after he had time to concoct a story; that Wegmann committed burglary when he went into Light's apartment and took her gun without permission; that Wegmann was trying to dispose of Light's body and may have intended to take it to Carder's; and, that the jury should not let defense counsel "clean up this purposeful act * * *. Don't let them do something [Wegmann] couldn't do that night." (Trial Tr., v. 5, p. 1119).
 {¶ 98} We cannot say that any of the above statements were erroneous. Contrary to Wegmann's assertion, the prosecutor did not interject the class's *Page 50 
opinions of Wegmann's guilt or innocence or urge the jury to convict him based on public demand. The prosecutor only related that his class asked if Wegmann called 9-1-1 after he shot Light, and did so in the context of walking the jury through the sequence of events the night of the shooting to emphasize that Wegmann did not call 9-1-1 immediately after shooting Light.
 {¶ 99} Moreover, the prosecutor's statements alleging that Dr. Beisser's conclusions were consistent, asserting that Wegmann concocted his story and may have even been attempting to frame Carder, and urging the jury not to let defense counsel clean up Wegmann's mess, were all reasonable inferences based upon the evidence submitted during trial.
 {¶ 100} Further, while the prosecutor's allusion to burglary may have been inappropriate given Wegmann was not charged with that crime, we cannot find that the comment rises to the level of being erroneous. Again, the statement was made in the context of reviewing the direct evidence in the case that Wegmann had taken Light's gun from her apartment without permission. Thus, we find that the prosecutor did not engage in misconduct.
 {¶ 101} Accordingly, we overrule Wegmann's fifth assignment of error.
 Jury Instructions {¶ 102} In his fourth assignment of error, Wegmann asserts that the trial court erred by improperly and prejudicially instructing the jury on accident and *Page 51 
foreseeability. Specifically, Wegmann contends that the trial court misled the jury by using "unlawful act" instead of "lawful act" when giving the "accident" instruction, by using "foreseen" instead of "anticipated" during the "accident" instruction, and by giving the general Ohio Jury Instruction on "foreseeability" used in civil negligence cases. We disagree.
 {¶ 103} It is well settled that a criminal defendant is entitled to a complete and accurate jury instruction on all issues raised by the evidence. State v. Williford (1990), 49 Ohio St.3d 247, 251. However, the precise language of a jury instruction is within the trial court's discretion and will not be disturbed absent an abuse of discretion.State v. Bailey, 8th Dist. No. 81498, 2003-Ohio-1834, ¶ 51, citingState v. Guster (1981), 66 Ohio St.2d 266, 271.
 {¶ 104} When reviewing the trial court's charge, a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." State v. Price (1979),60 Ohio St.2d 136, 141, citing Cupp v. Naughten (1973), 414 U.S. 141, 146-47; see, also, State v. Thompson (1987), 33 Ohio St.3d 1, 13. Viewing the instructions in their totality, if the law is clearly and fairly expressed, a reviewing court should not reverse a judgment based upon an error in a portion of a charge. Margroff v. Cornwell Quality Tools,Inc. (1991), 81 Ohio App.3d 174, 177; Yeager v. Riverside MethodistHosp. (1985), 24 Ohio App.3d 54, 55. Furthermore, there is a strong presumption in favor of the *Page 52 
adequacy of jury instructions. Instructions which, in their totality, are sufficiently clear to permit the jury to understand the relevant law shall not be the cause of a reversal upon appeal. Schade v. CarnegieBody Co. (1982), 70 Ohio St.2d 207, 210.
 {¶ 105} When the trial court instructed the jury on the accident defense, it used "foreseen" instead of "anticipate" and then defined "foreseeability" using the civil negligence definition in 1 OJI 7.13. Wegmann objected to both the use of "foreseen" and the definition of "foreseeability," which the trial court overruled. (Trial Tr., v. 4, pp. 929-30). When the trial court verbally instructed the jury, it stated that "[a]n accident is a mere physical happening or event, out of the usual order of things and not reasonably foreseen as a natural or probable result of an unlawful act." (Trial Tr., v. 5, p. 1133) (emphasis added). The trial court also informed the jury that it would provide written copies of the jury instructions.
 {¶ 106} Wegmann first argues that the trial court misled the jury by using "unlawful" instead of "lawful" when verbally instructing the jury on the accident defense. The trial court used the definition of accident provided in Ohio Jury Instructions (OJI) which states, in pertinent part, that an accident "is a mere physical happening or event, out of the usual order of things and not reasonably (anticipated) (foreseen) as a natural or probable result of a lawful act." 4 OJI 411.01(2) (emphasis added). The trial court apparently misspoke and said *Page 53 
"unlawful act" instead of "lawful act." However, Wegmann failed to object to the trial court's misstatement, thereby waiving all but plain error. State v. Braden, 98 Ohio St.3d 354, 2003-Ohio-1325, at ¶ 75, citing State v. Long (1978), 53 Ohio St.2d 91, paragraphs one and two of the syllabus, and Crim.R. 30(A). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68.
 {¶ 107} Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." State v. Biros, 78 Ohio St.3d 426, 431, 1997-Ohio-204; see, also, State v. Johnson, 3d Dist. No. 2-98-39, 1999-Ohio-825, and Crim.R. 52(B). Moreover, "[t]he general tendency of reviewing courts is to disregard mere `technical errors or verbal slips,' when, from the context, it appears that comprehensive and correct instructions have been given and substantial justice has been done." Washington v.Niemeyer (1997), 11th Dist. No. 97-P-0002, 1997 WL 586095, quotingFairchild v. Lake Shore Elec. Ry. Co. (1920), 101 Ohio St. 261, 268.
 {¶ 108} Looking at the context of the overall charge on accident, we cannot say that the trial court's use of "unlawful" instead of "lawful" during the verbal instruction rises to the level of plain error. This is particularly so given the trial court also provided the jury with written copies of the jury instructions, which *Page 54 
gave the correct instruction.[3] Thus, we find that the trial court did not commit plain error in mistakenly using "unlawful" instead of "lawful" in its verbal instruction on the accident defense.
 {¶ 109} Next, Wegmann argues that the trial court erred by using "foreseen" instead of "anticipated" and by providing the civil definition of foreseeability, because by doing so it directed the jury to find him guilty based on a lesser mens rea and transformed the subjective test of the accident defense into an objective one. We first note that, as set forth above, the OJI accident instruction provides for the use of either "anticipated" or "foreseen." Thus, we cannot say that the trial court erred by choosing to use the term "foreseen" instead of "anticipated."
 {¶ 110} Furthermore, although Wegmann is correct in asserting that the Supreme Court of Ohio has cautioned against the use of foreseeability in homicide cases, see State v. Burchfield, 66 Ohio St.3d 261, 263,1993-Ohio-44, the Court has also held that the error is not reversible "`where the instructions as a whole make clear that the jury must find purpose to kill in order to convict.'" Braden, 98 Ohio St.3d at ¶ 76, quoting State v. Phillips, 74 Ohio St.3d 72, 100, 1995-Ohio-171. *Page 55 
 {¶ 111} In this case, the trial court erroneously used the civil definition of "foreseeable" when it instructed the jury in a criminal case. However, the trial court defined "foreseeable" when it instructed the jury on the accident defense. If anything, the use of a seemingly lower-threshold, civil standard in the accident instruction prejudiced the State — not Wegmann — by making it easier to meet the criteria for the accident defense. Moreover, the instructions as a whole unequivocally made clear that purpose to kill was required to convict Wegmann for murder. Thus, we find that Wegmann's reliance onBurchfield and similar cases is misplaced and that the trial court's error was harmless.
 {¶ 112} Likewise, Wegmann's assertion that the use of foreseeability in the accident instruction somehow transformed the subjective test for the accident defense into an objective one also lacks merit. First, Wegmann cites no authority for his assertion that the test for accident is purely subjective. Second, a review of the pertinent instruction indicates that both a subjective and objective portion is included:
 An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event, out of the usual order of things and not reasonably foreseen as a natural or probable result of a lawful act.
4 OJI 411.01(2) (emphasis added). Clearly, while the first sentence includes references to subjective criteria — intent, design, and purpose — the second sentence *Page 56 
suggests objective criteria must be met as well given the use of "reasonably" as a qualifier for "foreseen." Thus, we cannot find that the trial court altered the requirements of the accident defense in such a way as to prejudice Wegmann.
 {¶ 113} Accordingly, we overrule Wegmann's fourth assignment of error.
 Cumulative Error {¶ 114} In his ninth and final assignment of error, Wegmann asserts that the cumulative effect of numerous errors during the proceedings resulted in a fundamentally unfair trial. We disagree.
 {¶ 115} Under the cumulative error doctrine, "[although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." State v. DeMarco (1987),31 Ohio St.3d 191, 196-97.
 {¶ 116} After reviewing the properly admitted evidence, we find that the cumulative effect of the improperly admitted evidence was not sufficient to deprive Wegmann of a fair trial. It is clear beyond a reasonable doubt that the large amount of properly admitted evidence, standing alone, constituted overwhelming evidence of Wegmann's guilt. See, e.g., State v. Williams (1988), 38 Ohio St.3d 346. It is also clear that, when viewed in their entirety, the improprieties did not contribute to Wegmann's conviction. *Page 57 
 {¶ 117} Accordingly, we overrule Wegmann's ninth assignment of error.
 {¶ 118} Having found no error prejudicial to the Appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 PRESTON and WILLAMOWSKI, JJ., concur.
[1] Moser also lived in the same apartment building as Light and Wegmann.
[2] Prior to the video playback, Wegmann renewed his motion in limine regarding particular statements, which the trial court overruled.
[3] We note that a copy of the written jury instructions was not initially on file with the record as required by R.C. 2945.10(G). While we were subsequently able to retrieve a copy, in the future the trial court should take care to keep a copy of the written jury instructions on file with the papers of the case for review on appeal. *Page 1