[Cite as *State v. Leeper*, 2024-Ohio-4965.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

      v.

ELIJAH T. LEEPER,

    DEFENDANT-APPELLANT.

CASE NO. 8-24-01

O P I N I O N

Appeal from Logan County Common Pleas Court
General Division
Trial Court No. CR 23 01 0022

Judgment Affirmed

Date of Decision: October 15, 2024

APPEARANCES:

    *William T. Cramer* for Appellant

    *Nathan Yohey* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Elijah Leeper ("Leeper"), appeals the judgment of conviction and sentence entered against him in the Logan County Common Pleas Court, following a jury trial and a trial to the court that resulted in Leeper being found guilty of multiple felony charges and specifications. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on January 11, 2023, when a Logan County grand jury returned a seven-count indictment against Leeper, charging him as follows: Count 1 – Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(1); Count 2 – Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(1); Count 3 – Having Weapons While Under Disability, a third-degree felony in violation of R.C. 2923.13(A)(2); Count 4 – Domestic Violence, a fourth-degree felony in violation of R.C. 2919.25(A) and (D)(3); Count 5 – Possession of Cocaine, a fifth-degree felony in violation of R.C. 2925.11(A); Count 6 – Unauthorized Use of a Vehicle, a first-degree misdemeanor in violation of R.C. 2913.03(A); and Count 7 – Endangering Children, a first-degree misdemeanor in violation of R.C. 2919.22(A).

{¶3} On January 13, 2023, an arraignment was held and Leeper entered pleas of not guilty to all counts of the indictment.

{¶4} On February 8, 2023, a superseding indictment was filed, in which an eighth count was added to the original indictment. Count 8 of the superseding indictment charged Leeper with Attempted Murder in violation of R.C. 2923.02 and R.C. 2903.02(A).

{¶5} On February 9, 2023, Leeper was arraigned on the superseding indictment, to which he pled not guilty.

{¶6} On November 14, 2023, a second superseding indictment was filed. In that indictment, a firearm specification pursuant to R.C. 2941.145 was added to Counts 1, 2, 4, and 8; a firearm specification pursuant to R.C. 2941.141 was added to Count 3; and a repeat violent offender specification pursuant to R.C. 2941.149 was added to Counts 1, 2, and 8.

{¶7} On November 17, 2023, Leeper was arraigned on the second superseding indictment, and he again entered pleas of not guilty.

{¶8} On November 29, 2023, a jury trial was scheduled to be held in the case. That morning, just prior to the start of the trial, the State of Ohio made an oral motion to dismiss Counts 5 and 7, which was granted by the trial court. At that time, Leeper also waived his right to trial by jury as to Counts 3 and 4.

{¶9} A two-day jury trial was then held as to Counts 1, 2, 6, and 8, simultaneously with Counts 3 and 4 being tried to the court. During the trial proceedings, the prosecution presented the testimony of six witnesses and

introduced a number of exhibits. After the State rested its case, the defense presented the testimony of one witness and admitted three exhibits.

**{¶10}** Following closing arguments by counsel and instructions of law by the trial court, the jury received the case for deliberation on December 1, 2023 at 3:07 p.m.

**{¶11}** Later that afternoon, while the jury was still deliberating, the jury foreperson informed the bailiff that mixed in with the trial exhibits provided to the jury was a document that did not appear to be part of the evidence. The bailiff retrieved that document and provided it to the trial court, who then went on record with counsel. Upon review, it was discovered that the document was a copy of a written stipulation by the parties relating to a prior Felonious Assault conviction of Leeper's that was an element of the crime of Having Weapons Under Disability charged in Count 3 and also an element of the Domestic Violence offense charged in Count 4. As Counts 3 and 4 were the two counts being tried to the court, the stipulation had been marked as State's Exhibit X and had been submitted for the trial court's review in the bench trial but a copy of State's Exhibit X had inadvertently been included in the jury trial exhibits delivered to the jury for consideration during its deliberations on the other counts.

**{¶12}** At that time, defense counsel moved for a mistrial, which the trial court denied on the basis that the motion was premature. The trial court then had the jury brought into the courtroom. The court questioned the jurors about their exposure to

State's Exhibit X and then polled the jury regarding that document. After each juror affirmed that he or she did not know or did not understand the contents of State's Exhibit X, the trial court instructed the jury that it must disregard State's Exhibit X and must decide the case solely on the evidence presented at trial. The jury was then returned to the jury room to resume deliberations.

{¶13} At 6:37 p.m. on that same date, the jury returned verdicts on the four counts at issue in the jury trial. Leeper was found guilty of Felonious Assault as charged in Count 1 but was found not guilty on the firearm specification relating to that count. Similarly, on Count 2, Leeper was found guilty of Felonious Assault but was found not guilty on the firearm specification relating to Count 2. On Count 6, Leeper was found not guilty of Unauthorized Use of a Vehicle. On Count 8, Leeper was found guilty of Attempted Murder but was found not guilty on the firearm specification relating to Count 8.

{¶14} The trial court accepted the verdicts and discharged the jury. The trial court then found that Leeper was guilty beyond a reasonable doubt of the crimes and firearm specifications charged in Counts 3 and 4, being the counts at issue in the bench trial. The trial court ordered a presentence investigation and scheduled a sentencing hearing for a later date.

{¶15} On January 2, 2024, a sentencing hearing was held. As an initial matter, the State of Ohio conceded, and the trial court determined, that Count 2 merged with Count 8, and the prosecution elected to proceed to sentencing on Count

8. The prosecution also conceded that the firearm specification on Count 3 merged with the firearm specification on Count 4, and the State elected to proceed to sentencing on the Count 4 specification. Next, the trial court found Leeper to be a repeat violent offender as alleged in the specifications on Counts 1 and 8. Finally, the trial court sentenced Leeper to an aggregate sentence of a minimum of 20 years in prison and up to a potential maximum of 26.5 years in prison.

{¶16} On January 5, 2024, Leeper filed the instant appeal.

*Summary of Evidence Presented at Trial*

{¶17} On January 1, 2023, shortly after midnight, Leeper threatened and violently assaulted his girlfriend, "E.H.", at her West Liberty home where the couple had been living together along with the victim's three minor children.

{¶18} The incident began after E.H. received a message via Facebook Messenger from Leeper around 10:00 p.m. on December 31, 2022, requesting that she come and pick him up at a New Year's Eve party he was attending. E.H. initially replied that her children were asleep and she did not want to leave her house. In response, Leeper accused E.H. of cheating on him, and then sent her several more messages that were progressively angrier in tone. In one of those messages, Leeper said if he had to walk home and found someone else there, E.H. would be dead. Ultimately, E.H. agreed to pick up Leeper.

{¶19} E.H. put her children in the car and drove to the party. While waiting in the car for Leeper, E.H. heard guns being fired by persons at the party, and so she

messaged Leeper to hurry up. Leeper came out and got in the car, and E.H. observed he was intoxicated. However, during the drive home, Leeper remained quiet and said nothing.

{¶20} Once the couple arrived home and walked into the house, Leeper told E.H. that she had five seconds to put her children in their bedroom. E.H. was holding her youngest child, a one-year old, in her arms at the time. E.H. replied to Leeper that she was not comfortable with his mood and that she was not going to put her child down. In response, Leeper grabbed E.H. and threw her into the kitchen, where she landed on the floor while still holding the baby. Leeper again told E.H. she had five seconds to put the kids in their room and to shut the door, which E.H. did.

{¶21} Leeper then attacked E.H., grabbing her by the shirt, smacking her face into a door knob, and then throwing her on the floor again and trying to strangle her. While doing so, Leeper was yelling at E.H., calling her a "stupid bitch" and saying this was her fault because she had someone over and had sex with them. Leeper then pulled a firearm belonging to E.H. out of his pocket and set the gun on the table. E.H. had purchased the gun for protection in her job as a delivery driver, and normally kept it in an unlocked lockbox in her bedroom closet. Leeper was with E.H. when she bought the firearm and he was also aware of where E.H. stored the gun. E.H. had fired the gun previously and knew that it was operable. The firearm was a Taurus G3 nine-millimeter and was loaded.

{¶22} Once Leeper produced the gun, E.H. stood still in the dining room. Leeper then picked the firearm up off the table and went into the E.H.'s bedroom, where it sounded like he was loading the gun. Leeper came out of the bedroom, pointed the gun at E.H.'s head, and told her she was going to die.

{¶23} E.H.'s young daughter heard E.H. screaming and the child poked her head out of her bedroom. Leeper grabbed E.H. by the shirt and began jabbing her in the back of the head with the front end of the gun's barrel, while telling her to put the child to bed. E.H. went to the bedroom and quieted her daughter, and then walked back into the dining room. At that point, Leeper again grabbed E.H. by the neck and attempted to asphyxiate her. E.H. initially tried to defend herself but became too exhausted to continue fighting back. Leeper continued to apply pressure with his both of his hands around her neck and E.H. passed out on the floor.

{¶24} E.H. did not know how long she remained unconscious on the floor, but she was awakened by Leeper splashing water in her face and telling her to get up. E.H. did not get up, and so Leeper again grabbed her by the neck and began choking her. E.H. passed out for a second time on the kitchen floor, with her face landing in the dog's food and water bowls.

{¶25} As E.H. started to regain consciousness, she heard Leeper walking around the home, saying things like, "I'm not playing with you, you dumb bitch" and "get the fuck up." E.H.'s infant son then began to cry, and Leeper told E.H. to shut up the baby or else he would. E.H. went to the baby's room to try to calm the

child. As she stood by the baby's crib, Leeper told E.H., "[l]ook what you made me do" and "this is all your fault." E.H. did not reply, and just kept patting her son's back to try to keep him asleep. Leeper then told E.H. he was taking her car and her gun and was leaving, which he did.

**{¶26}** E.H. telephoned her sister for assistance and her sister called the police. E.H.'s sister and mother stayed on the phone with her until the police arrived, at which time E.H. ran outside and cried out to the officer to help her.

**{¶27}** Patrol officer Brian Snider of the West Liberty Police Department was the first officer who responded to the scene. Upon his arrival, E.H. came out of the house screaming for help, yelling "he's got my gun." Snider asked E.H. if she had been hurt, and Snider observed injuries to E.H.'s face and neck. E.H.'s two children were in the house, and her father quickly showed up. Additional officers arrived, along with EMS personnel to render medical aid to E.H. In addition to speaking with Snider and a paramedic, E.H. wrote out a brief statement as to what had happened. E.H. showed Officer Snider the empty lockbox where her missing firearm was typically kept. E.H. was then transported by ambulance to Mary Rutan Hospital. After E. H. was treated and released at the local hospital, she and her youngest child were taken to a domestic violence safe house later that night, while the other children remained in the care of relatives, as Leeper's whereabouts were unknown.

{¶28} After E.H. left her house for the hospital, Officer Snider stood by while E.H.'s father secured her home. Once all the doors were locked, the father left the residence, and then Snider did as well. Snider called Logan County dispatch and requested a "BOLO", meaning "be on the lookout", be issued for E.H.'s vehicle.

{¶29} At 7:30 that morning, Officer Snider was notified by dispatch that there had just been a 911 hang-up call traced to E.H.'s house. Snider advised dispatch that he would be enroute to the home, as Snider believed there was a possibility that Leeper may have returned to the house. As Officer Snider was driving his cruiser up the alley that led to E.H.'s house, he saw a male come out the back door of the home. Parked at the rear of the house was a car of the same make and color as E.H.'s missing vehicle. Officer Snider recognized the male coming out of the house as Leeper, whom Snider knew from a prior unrelated call. Snider approached Leeper, patted him down to make sure he did not have a weapon on him, and took him into custody once backup arrived. No firearm was found on Leeper's person at that time. Although he was under arrest, Leeper was transported to the hospital based on his erratic behavior and comments.

{¶30} While at the hospital, Officer Snider was notified that he would need to return to E.H.'s house, as officers at the scene there had located the missing firearm belonging to E.H. Once back at the house, Snider was directed by the other officers to a black duffel bag in the master bedroom closet. Inside the bag, which

was identified as belonging to Leeper, was the firearm, which Snider secured, photographed, and then subsequently logged into evidence.

{¶31} As a result of the assaults perpetrated on her by Leeper, E.H. sustained injuries that included a swollen and blackened eye, scratches and marks on her neck, bruises on various parts of her body, and pain that felt like she had been "hit by a truck." E.H. was subsequently diagnosed with a traumatic brain injury and post-traumatic stress disorder as a result of the attack by Leeper, and she was still receiving treatment for those conditions at the time of trial. E.H. also sustained a torn meniscus in her knee as a result of having been thrown down on the kitchen floor, which required surgery to repair it.

*Claims on Appeal*

{¶32} In this appeal, Leeper raises three assignments of error for our review.

**First Assignment of Error**

**Appellant's due process rights were violated by misleading jury instructions on the purpose element for attempted murder.**

**Second Assignment of Error**

**The trial court abused its discretion by denying a mistrial after the jury was improperly exposed to an unadmitted exhibit stipulating that appellant had a prior conviction for a similar offense.**

**Third Assignment of Error**

**The trial court's finding on the firearm specification attached to the domestic violence count and guilty verdict on the weapon under disability count were against the weight of the evidence.**

*First Assignment of Error*

**{¶33}** In the first assignment of error, Leeper asserts that the trial court erred in giving the jury instructions relating to Count 8.

**{¶34}** In Count 8, Leeper was charged with Attempted Murder in violation of R.C. 2923.02(A) and R.C. 2903.02(A).

**{¶35}** R.C. 2923.02 governs attempts to commit criminal offenses. R.C. 2923.02(A) provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

**{¶36}** R.C. 2903.02(A) defines the offense of Murder applicable here, and provides in relevant part that "[n]o person shall purposely cause the death of another * * * ."

**{¶37}** Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

**{¶38}** At trial in this case, the trial court instructed the jury on Count 8 as follows:

> Count Eight: The defendant in Count Eight is charged with an attempt to commit the offense of murder. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 1st day of January, 2023 and [*sic*] Logan County, Ohio, the defendant

purposely engaged in conduct that if successful would have constituted or resulted in the commission of the offense of murder. A criminal attempt occurs when one purposely does anything that is an act constituting a substantial step in a course of conduct, plan, [*sic*] culminate in his commission of the offense. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose. A person acts purposely when it is the person's specific intention to cause a certain result or engage in conduct of a certain nature.

It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to attempt to commit murder. *For [sic] the central idea, essence, or gist of the offense is a prohibition against conduct of a certain nature, a person acts purposely regardless of what the person intended to accomplish thereby if it was the person's specific intent to engage in conduct of that nature.* The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all other facts and circumstances in evidence.

The defendant is charged with attempted murder. Before you can find the defendant guilty of attempted murder, you must find beyond a reasonable doubt that on or about the 1st day of January, 2023 and in Logan County, Ohio the defendant purposely attempted to cause the death of Emily Heath. All words and phrases defined for you above have the same meaning in this count. If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of attempted murder, your verdict must be guilty. If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of the offense of attempted murder, then your verdict must be not guilty.

(Tr., 403-404).

{¶39} On appeal, Leeper argues that, when instructing the jury on Count 8, the trial court erred in including in the language italicized above. That portion of the instruction stems from the definition of "purposely" set forth in R.C. 2901.22(A), *supra*, which defines "purposely" in the alternative, one option being

applicable where the offense at issue requires proof of a specific intent, as is the case here, and the other option being applicable when the gist of the offense at issue prohibits specific conduct, regardless of what the offender intended to accomplish by engaging in such conduct.

**{¶40}** Leeper asserts that the trial court should not have read the "gist of the offense" alternative to the jury when instructing on the purpose required as to Count 8.  Leeper argues that such an instruction is not applicable to this case and that, in giving it, the trial court relieved the jury from having to find that Leeper possessed a specific intent to kill.

**{¶41}** In analyzing this claim, we note first that Leeper lodged no objection to the jury instruction on Count 8.  Accordingly, Leeper's failure to object waived all but plain error as to this claim. *State v. Braden,* 2003–Ohio–1325, at ¶ 75, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraphs one and two of the syllabus, and Crim.R. 30(A).  Even in the context of jury instructions, "[p]lain error 'should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice.'" *State v. Skatzes*, 2004-Ohio-6391, ¶ 52, quoting *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus. "Plain error exists only where it is clear that the verdict would have been otherwise but for the error." *Skatzes*, *supra*, at ¶ 52, citing *State v. Long*, 53 Ohio St.2d 91 (1978).

**{¶42}** Moreover, as this Court explained in *State v. Rentschler*, 2023-Ohio-3009 (3d Dist.):

-14-

"When reviewing the trial court's charge, a 'single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' *State v. Price* (1979), 60 Ohio St.2d 136, 141 [398 N.E.2d 772], citing *Cupp v. Naughten* (1973), 414 U.S. 141, 146–47 [94 S.Ct. 396, 38 L.Ed.2d 368]; see, also, *State v. Thompson* (1987), 33 Ohio St.3d 1, 13 [514 N.E.2d 407]. Viewing the instructions in their totality, if the law is clearly and fairly expressed, a reviewing court should not reverse a judgment based upon an error in a portion of a charge. *Margroff v. Cornwell Quality Tools, Inc.* (1991), 81 Ohio App.3d 174, 177 [610 N.E.2d 1006]; *Yeager v. Riverside Methodist Hosp.* (1985), 24 Ohio App.3d 54, 55 [493 N.E.2d 559]. Furthermore, there is a strong presumption in favor of the adequacy of jury instructions. Instructions which, in their totality, are sufficiently clear to permit the jury to understand the relevant law shall not be the cause of a reversal upon appeal. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210 [436 N.E.2d 1000]."

*Id.*, at ¶ 84, quoting *State v. Wegmann*, 2008-Ohio-622, ¶ 104 (3d Dist.).

**{¶43}** As Leeper accurately points out, in addition to the language defining "purposely" in R.C. 2901.22(A), 2 OJI-CR417.01 clearly sets forth the "specific intent" instruction and the "gist of the offense" instruction as alternatives when instructing on purpose, and notes that the latter will be given in rare cases where specific conduct is prohibited, regardless of intent, such as Corruption of a Minor in violation of R.C. 2907.04. *Ohio Jury Instructions*, CR Sec. 417.01 (Rev. 1/10/15).

**{¶44}** In *State v. Wilson*, 74 Ohio St.3d 381 (1996), the Supreme Court of Ohio addressed this issue and noted that, "[a]dmittedly, the 'gist of the offense' language is confusing in a murder prosecution which requires 'purpose.'" *Id.*, at 393. However, in that case, the Ohio Supreme Court determined that giving the "gist of the offense" instruction was not reversible error when, in the context of all

the instructions given the jury, the trial court provided adequate instructions on the element of specific intent to kill and when the evidence of the defendant's guilt was strong. *Accord State v. Joseph*, 1993 WL 531858 (3d Dist. Dec. 23, 1993); *State v. Trzeciaki*, 2015-Ohio-2219, ¶¶ 9-12 (12th Dist.); *State v. Petit*, 2000 WL 897993 (4th Dist. July 5, 2000).

{¶45} On the basis of the precedent cited, and in light of the record in the case before us, we do not find that plain error resulted from the trial court including the "gist of the offense" instruction here.  Among the other instructions given to the jury in this case as to Count 8 were the directives that "[i]t must be established in this case that at the time in question there was present in the mind of the defendant *a specific intention to attempt to commit murder*" and that "[*b*]*efore you can find the defendant guilty of attempted murder, you must find beyond a reasonable doubt that* on or about the 1st day of January, 2023 and in Logan County, Ohio *the defendant purposely attempted to cause the death of* [*E.H.*]." (Emphasis added.)  When read as a whole, the trial court's instructions clearly indicate that the jury had to find beyond a reasonable doubt that Leeper intended to kill E.H. in order to find Leeper guilty on Count 8.  Additionally, the evidence upon which Leeper was convicted in Count 8 was clear and unequivocal in establishing that he possessed the intent to kill E.H. and then attempted to do so, including but not limited to the fact that he made specific threats of death to E.H. on the night in

question, that he pointed a firearm at her head while threatening to kill her, and that he twice strangled her to the point of unconsciousness.

**{¶46}** As Leeper's claim of plain error with regard the jury instruction on Count 8 lacks merit, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶47}** In the second assignment of error, Leeper argues that a mistrial should have been granted when the jury, during deliberations, was exposed to State's Exhibit X, a document that was not admitted as evidence in the jury trial. As noted above, State's Exhibit X was a written stipulation entered into by the parties that was submitted as evidence to the trial court in the bench trial on Counts 3 and 4, and a copy of that stipulation was inadvertently included in the exhibits given to the jury for consideration during their deliberations on the counts at issue in the jury trial. As a result, the defense moved for a mistrial, which the trial court denied.

**{¶48}** The decision to grant or deny "a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001), citing Crim.R. 33; *State v. Sage*, 31 Ohio St.3d 173, 382 (1987). An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *State v. Clark*, 71 Ohio St.3d 466, 470 (1994). "'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *.'" *Treesh*, at 480, quoting *State v. Reynolds*, 49

-17-

Ohio App.3d 27, 33 (1988). "The granting of a mistrial is necessary only when a fair trial is no longer possible. *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶49} When unadmitted evidence is mistakenly submitted to a jury, if that evidence is repetitive or cumulative of other evidence introduced at trial, the error is harmless. *State v. Locklin,* 2006–Ohio–3855, ¶ 12 (2d Dist.), citing *State v. Cooper*, 52 Ohio St.2d 163 (1977); *State v. Grant,* 1993–Ohio–171. On the other hand, if the unadmitted exhibits do not duplicate other evidence admitted at trial and they prejudice the defendant and the evidence of defendant's guilt is not overwhelming, then the conviction cannot stand. *Locklin*, at ¶ 12, citing *State v. Westwood*, 2002-Ohio-2445 (4th Dist.). *Accord*, *State v. Adams*, 2008-Ohio-3136, ¶ 12 (8th Dist.).

{¶50} In the instant case, there is no dispute that State's Exhibit X, which was not evidence in the jury trial, was mistakenly given to the jury and taken into the jury room. However, while Leeper suggests on appeal that State's Exhibit X was evidence of his prior conviction and therefore highly inflammatory and prejudicial, a review of the record reflects otherwise.

{¶51} In actuality, State's Exhibit X was a document captioned with the instant case name and number, and titled "Stipulation of the Parties." Other than the signature lines for the attorneys, State's Exhibit X read in its entirety as follows:

> For the purpose of trial and with respect to State's Exhibit X-1 Judgment Entry from the Logan County Court of Common Pleas Case No. CR19-12-0373 filed September 23, 2020 and to State's Exhibit X-2 Nunc Pro Tunc Judgment Entry from the Logan County Court of Common Pleas Case No. CR19-12-0373 filed September 24, 2020, the parties in the above-styled matter agree and stipulate to the following facts:
>
> 1. The "Elijah Leeper" identified as the Defendant in these entries is the same Elijah T. Leeper indicted in the above-styled case and
>
> 2. The victim of the conviction for Count Ten Felonious Assault was a family or household member as defined in R.C. 29219.25(F)(1).

(Docket No. 139).

{¶52} State's Exhibits X-1 and X-2, the actual certified copies of the judgment entries memorializing Leeper's prior conviction and which are referenced in State's Exhibit X, were provided solely to the trial court as intended and it was only State's Exhibit X, the stipulation itself, that was mistakenly provided to the jury.

{¶53} This issue came to light while the jury was deliberating, when the jury foreperson notified the bailiff that the jury had a document that did not appear to be part of the evidence. The bailiff retrieved that document from the jury room and provided it to the trial court, who then went on record with counsel. At that time, defense counsel moved for a mistrial, which the trial court denied on the basis that the motion was premature.

{¶54} The trial court then had the jury brought into the courtroom. The court questioned the jurors about their exposure to State's Exhibit X and then polled the

jury regarding that document. The juror's responses reflected that only one juror had read the entire document and that juror stated that she did not know what it meant. Two other jurors acknowledged that they had begun reading State's Exhibit X, but stated that they only read as far as the date before realizing that the document did not relate to the instant case. The jury foreperson then took possession of State's Exhibit X and notified the bailiff. The trial court further verified that the jury foreperson had provided State's Exhibit X to the bailiff within approximately three minutes of having discovered the document. When polled by the trial court, each juror affirmed that he or she did not know or did not understand the contents of State's Exhibit X. Finally, the trial court instructed the jury that it must disregard State's Exhibit X and must decide the case solely on the evidence presented at trial. The jury was then sent back to the jury room to resume deliberations.

{¶55} On those facts, we find no abuse of discretion by the trial court in denying Leeper's motion for a mistrial, as the jury's brief possession of State's Exhibit X was established to be harmless. While there was no question that three of the jurors viewed the unadmitted exhibit in whole or in part, those jurors indicated that they did not understand what it was they read. Those jurors also realized that the document did not relate to the case at hand and was not for their consideration. More importantly, the contents of State's Exhibit X did not provide any explanation of the judgment entries referenced by the stipulation contained therein, nor was there any express reference to the fact that the case mentioned was a criminal case. The

trial court also instructed the jury that it could not consider the document and that the case must be decided strictly on the evidence admitted at trial. Finally, we note that the jury was presented with overwhelming evidence of Leeper's guilt at trial.

{¶56} Accordingly, Leeper has not demonstrated that such prejudice occurred as to warrant a mistrial, and the second assignment of error is overruled.

*Third Assignment of Error*

{¶57} In the third assignment of error, Leeper argues that the trial court's findings of guilt as to Count 3 and as to the firearm specification on Count 4 were against the manifest weight of the evidence. We disagree.

{¶58} When reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate

court overturn the trial court's judgment." *State v. Haller*, 1-11-34, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2001-Ohio-6524, ¶ 119.

**{¶59}** In the instant case, as to Count 3, the trial court found Leeper to be guilty of Having Weapons While Under Disability in violation of R.C. 2923.13(A)(2). R.C. 2923.13(A)(2) provides, in relevant part, that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been convicted of any felony offense of violence[.]" In Count 3, Leeper was also convicted of a one-year firearm specification pursuant to R.C. 2941.141. R.C. 2941.141(A) provides that an additional mandatory year of prison time shall be imposed if the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense."

**{¶60}** On Count 4, Leeper was found by the trial court to be guilty of Domestic Violence, a felony of the fourth degree in violation of R.C. 2919.25(A) and (D)(3), and guilty of a three-year firearm specification pursuant to R.C. 2941.145. R.C. 2941.145(A) provides that an additional mandatory 3-year prison term shall be imposed if the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶61} On appeal, Leeper's manifest weight arguments focus strictly on the evidence relating to whether Leeper possessed a firearm as required for him to have been found guilty of Having Weapons Under Disability in Count 3 and as also required for him to have been found guilty on the firearm specification in Count 3, and on the evidence relating to whether Leeper possessed and brandished a firearm as required for him to have been found guilty on the firearm specification in Count 4.

{¶62} Pursuant to R.C. 2923.11(B)(1), as used in R.C. 2923.13, "firearm" means "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant" and "includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable."  Pursuant to R.C. 2923.11(B)(2), "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."

{¶63} Similarly, to convict a defendant of a firearm specification, evidence beyond a reasonable doubt must be presented "that the firearm was operable, or could readily have been rendered operable, at the time of the offense." *State v. Murphy*, 49 Ohio St.3d 206, 208–209 (1990).  "This proof does not require the production of the firearm or empirical analysis of the firearm." *State v. Marbury*,

2004-Ohio-3373, ¶ 32 (10th Dist.), citing *Murphy* at 209. Rather, "such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *Murphy*, at syllabus, modifying *State v. Gaines*, 46 Ohio St.3d 65 (1989).

{¶64} In this case, Leeper does not contest that the weapon recovered by the police and introduced in evidence at trial was proven to be an operable firearm as defined by law. Rather, Leeper contends that the trial court's findings that he possessed and brandished a firearm are questionable as those findings are inconsistent with the fact that the jury found Leeper not guilty of the firearm specifications relating to the charges of Felonious Assault and Attempted Murder. In support of his argument, Leeper also points to evidence introduced at trial that the victim, E.H., did not mention the firearm to the paramedic who assessed her at the scene immediately after the incident, and that no reference to a firearm was made in the written statement that E.H. filled out at that same time.

{¶65} However, after reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we are not persuaded that the trial court, as the trier of fact on Counts 3 and 4, lost its way and created such a miscarriage of justice that Leeper's convictions on the weapons charge and firearm specification in Count 3 and on the Count 4 firearm specification must be reversed.

{¶66} First of all, as Leeper notes in his merit brief, there is no legal requirement that the trial court's findings in the bench trial need to be consistent

-24-

with the jury's verdicts. *See*, *e.g.*, *State v. Eason*, 2016-Ohio-5516, ¶¶ 61-69 (8th Dist).

**{¶67}** More importantly, there was substantial and credible evidence from which the trial court could have concluded, beyond a reasonable doubt, that Leeper had a firearm in his possession and under his control, and that he brandished the firearm during the commission of the crimes at issue in the bench trial. E.H. testified in very specific and extensive detail as to Leeper's use of the firearm during the offenses at issue, in addition to providing testimony regarding her ownership of the firearm, why and when she had acquired it, where it was normally kept, and Leeper's knowledge of those facts. Officer Snider's testimony confirmed that the lockbox in E.H.'s bedroom where the gun was typically stored was empty immediately after the offenses occurred, and his testimony in conjunction with that of E.H. served to establish that the firearm was subsequently located by the police in Leeper's duffel bag in the bedroom closet just after Leeper was found by Snider to have been back on the premises. Finally, regarding Leeper's argument that E.H. did not mention the firearm to the paramedic or in her initial written statement, it was established through the evidence at trial that E.H. was not assessed or treated by the paramedic for any firearm-related injuries and therefore she had no reason to mention the gun to him. It was also established that the brief statement written by E.H. at the scene was completed under very stressful and chaotic circumstances and that, while E.H. did not mention the firearm in that written statement, she had

immediately informed Officer Snider upon his arrival at the scene that a firearm had been involved in the crimes.

**{¶68}** Thus, in light of all the evidence presented to the trial court for its consideration of the weapons charge and firearm specification in Count 3 and the firearm specification in Count 4, we find that Leeper's convictions thereon were not against the manifest weight of the evidence with regard to the issue of whether a firearm was involved.

**{¶69}** The third assignment of error is overruled.

*Conclusion*

**{¶70}** Having found no error prejudicial to the defendant-appellant in the particulars assigned and argued, the judgment of conviction and sentence entered in the Logan County Court of Common Pleas is affirmed.

*Judgment affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**